Warren E. HALLE; THC Kentucky Coal Venture I LLC; and West Virginia Coal Venture I LLC, Appellants

v.

BANNER INDUSTRIES OF N.E., INC.; Gary J. Richard; and Pikeville Energy Group, LLC, Appellees

NO. 2012-CA-001997-MR

Court of Appeals of Kentucky.

RENDERED: DECEMBER 19, 2014; 10:00 A.M.

BRIEFS FOR APPELLANT: Michael J. Gartland, Billy R. Shelton, Lexington, Kentucky

BRIEF FOR APPELLEE: Joe F. Childers, Lexington, Kentucky

BEFORE: STUMBO, TAYLOR AND THOMPSON, JUDGES.

## OPINION

THOMPSON, JUDGE:

This action was filed by the appellees, Banner Industries of N.E., Inc., Gary J. Richard, and Pikeville Energy Group, LLC (PEG) against the appellants, Warren E. Halle, THC Kentucky Coal Venture I, LLC (THC), and West Virginia Coal Venture I, LLC, (WVCI).[1] The initial complaint alleged: (1) fraud in the inducement and breach of contract; (2) tortious interference with business relations; (3) civil conspiracy; (4) breach of contract-third party beneficiaries; and (5) trade disparagement. The appellees filed an amended complaint in which they withdrew the breach of contract-third party beneficiaries and trade disparagement claims but added a count of abuse of process solely against THC. The appellants maintain the Pike Circuit Court erred when it denied their

---

1. The complaint also named Tony Gannocone, III, Nathan Williams, and D. Hayden Fisher as defendants. They are not parties to the present appeal.

motion to dismiss all tort claims asserted against them based on absolute immunity under the judicial statements privilege. Alternatively, they argue no statements made in prior collateral bankruptcy proceedings and lawsuits may be used in support of the asserted tort claims.

The standard for granting a motion to dismiss pursuant to Kentucky Rules of Civil Procedure (CR)12.02, is well known:

> The court should not grant the motion unless it appears the pleading party would not be entitled to relief under any set of facts which could be proved in support of his claim. In making this decision, the circuit court is not required to make any factual determination; rather, the question is purely a matter of law. Stated another way, the court must ask if the facts alleged in the complaint can be proved, would the plaintiff be entitled to relief?

*James v. Wilson*, 95 S.W.3d 875, 883–84 (Ky.App.2002) (internal quotations and footnotes omitted). Therefore, our discussion of the facts is necessarily based on those alleged in the appellees' complaint and amended complaint. As our standard of review requires, for purposes of considering the trial court's denial of the appellants' motion to dismiss, we assume the facts alleged by the appellees are true.

In April 2005, now defunct Alma Energy, LLC, was formed in the Commonwealth of Virginia with three members, including Nathan Williams. In 2005, it purchased a mineral lease on 496 acres in Pike County and opened the Right Fork Energy Mine # 1. In June 2006, Alma purchased an adjacent mineral lease known as Netley Branch. In the spring of 2006, Alma began looking for investors. Nathan William's father contacted Tony Gannacone III, to assist in finding an investor and, ultimately, Halle decided to invest in Alma.

In July 2006, Halle, who was the owner and chief executive officer of THC, and Alma organized Kentucky Coal Venture I, (KCVI) as a corporate instrument to facilitate their joint venture. THC controlled all KCVI's decisions in the mining and selling coal from leases previously acquired by Alma and Alma's interests in the Kentucky coal leases were transferred to KCVI. As part of this arrangement, the interests of the two remaining initial members of Alma were transferred to Williams. In August 2006, by agreement, Alma was given an exclusive contract to mine all coal from properties owned by THC in Pike County for twenty years and to sell the coal mined from three specified mines in Pike County, including Netley Branch.

Soon after the execution of the exclusive contract, Alma found an opportunity for Halle to purchase metallurgical coal reserves and a coal preparation facility (the Glen Alum facility), located in West Virginia. Halle formed WVCI for the purpose of purchasing the Glen Alum facility for $12 million. At this point, in addition to his interest in KCVI and THC, Hale also owned directly or indirectly WVCI. We refer to these entities collectively as Halle Entities.

In early 2007, Halle Entities accused Alma of defaulting on the 2006 agreements, which appellees contend was the beginning of Halle Entities' plan to force Alma out of any participation in Glen Alum, a more profitable venture than the Kentucky operations.

At this point, Alma's relationship with Halle and Halle Entities became strained. KCVI began withholding funds from Alma forcing Alma to commence two reorganization proceedings under Chapter 11 in the federal bankruptcy court. In addition, three adversary proceedings in the bankruptcy court were commenced, a civil ac-

tion was filed by Halle Entities in the United States District Court for the District of Maryland and a civil action was filed by Alma in the Pike Circuit Court. The complaint alleges Halle had a history of structuring deals to "choke off his partners" and, after forcing them into bankruptcy, purchase the assets for minimal amounts.

In 2007, Halle, Halle Entities, and Alma were parties to a settlement agreement to resolve all claims and causes of action among the parties. Pursuant to the 2007 settlement agreement, Alma would resume mining operations and mining operations would be split along state lines giving appellants complete control over the Glen Alum facility and allowing Alma to operate the Kentucky mines. The agreement permitted Alma to suspend its mining activities and be idle for up to one year if the market price for coal fell below $60 per ton. In 2008, the 2007 agreement was approved by the bankruptcy court.

Alma attempted to restore the neglected Kentucky mines to productive operation and, with little or no working capital, sought outside investors. It is at this point, the appellees, Gary Richard, President of Banner, Banner, and PEG entered into Alma's business.

In reliance on the terms of the 2007 settlement agreement giving Alma the right to operate the Kentucky mines and sell the coal, Richard and PEG began providing financing to Alma. Richard used his personal money and money borrowed from Banner.

In the spring 2008, Alma and PEG representatives met with potential coal buyers and contracted with Appalachian Fuels. Because of Alma's debtor-in-possession status in its bankruptcy, an affiliated entity was to perform the actual mining and PEG would purchase the coal and resell it to third parties. Banner agreed to take out loans to finance PEG's equipment purchases for mining Alma coal. Loans from Banner to PEG and Richard, or to vendors for PEG's benefit, totaled $3.510 million.

By May, 2008, Alma was prepared to resume mining. When Alma filed a motion with the bankruptcy court to approve the interim mining agreement and allow commencement of mining operations, Halle Entities filed an objection raising numerous challenges to the proposed operation. The complaint alleges Halle Entities made various misrepresentations in its objection and at the hearing. It further alleges that after the hearing various threats were made by Halle Entities' representatives to Richard.

Despite the hostilities, PEG, Alma and Halle Entities attempted to negotiate a coal-purchase agreement. While negotiations were underway, Halle Entities filed a competing plan of reorganization in the Alma bankruptcy proceedings in an attempt to strip PEG of its contracts and transfer control over Alma to appellants.

Meanwhile, Consol Capital, LLC filed an unsecured creditors claim in the Alma bankruptcy proceeding. Gannacone was a managing member of Consol, which was an exclusive contractor to Halle Entities. The complaint alleges Gannacone wrongfully attempted to persuade the committee to support Halle Entities' reorganization plan. As a result, the opening of the Alma mines was delayed.

Eventually, Halle Entities withdrew their objection to the interim mining agreement involving PEG after being awarded exclusive rights to purchase all coal produced from Netley Branch pursuant to a coal purchase agreement dated June 30, 2008. The interim agreement was approved by the bankruptcy court. Over the next five months, Netley Branch mine generated substantial income.

Appellees further allege that in November 2008, WVCI and Halle Entities breached the 2007 settlement agreement and the 2008 coal purchase agreement when it abruptly cancelled the coal purchase agreement in an effort to drive Alma into liquidation. Although the 2007 settlement agreement permitted Alma to suspend mining operations for up to one year because of adverse market conditions, within two weeks after the cancellation, Halle Entities sought to have Alma's bankruptcy converted to a Chapter 7 liquidation.

The request was granted and Alma's case was converted to Chapter 7 liquidation on May 20, 2009, leaving PEG and Richard with no way to recover the $3.5 million they invested in Alma's operations. The Alma trustee sold Alma's equipment valued at $1.7 million to THC for $5,000 and the right to prosecute all of Alma's future claims were sold to THC for $500,000.

The complaint further alleges appellants met with D. Hayden Fischer, a member of PEG who signed a release of any claims PEG may have against appellants for breach of the 2008 coal purchase agreement. However, the release was not effective because Fischer had no authority to bind PEG.

In the summer of 2008, while Netley Branch was in operation, Richard solicited investors and contracted to receive $1,175,000. Appellees allege appellants interfered with those agreements and attempted to gain an advantage by wrongfully claiming damages against Richard and PEG for the amount of those investments.

These allegations of fact form the basis for appellees' claims. THC and WVCI filed motions to dismiss appellees' original complaint on all counts except for breach of contract arguing various defenses including that the claims depend on the judicial statements privilege. The motion was denied without explanation. After appellees filed their first amended complaint that included a claim for abuse of process, Halle filed a motion to dismiss the claims against him based on the judicial statements privilege that was also denied without explanation.

THC and WVCI appealed from the trial court order denying their motion to dismiss and Halle filed a separate appeal from the denial of his motion dismiss. By order of this Court, the appeals were consolidated. Subsequently, this Court dismissed the appeals because the appealed orders did not state the reason for their denial and, therefore, were interlocutory. Subsequent, the trial court issued an order clarifying the judicial statements privilege did not apply, and this appeal followed.

As appellants frame the issue, the question before the Court is whether appellants are shielded by the judicial statements privilege from liability for all tort actions asserted.[2] Appellees argue the judicial statements privilege should be restricted to claims for defamation predicated on statements made preliminary to or during judicial proceedings. As we understand the arguments, our inquiry is three-fold: (1) Does the judicial statements privilege apply to a litigant's conduct?; (2) Does the judicial statements privilege apply to each tort alleged?; and (3) Based on the allega-

---

**2.** We pause to note that case law has used the term judicial statements privilege as applicable to litigants, witnesses and to attorneys alike. Arguably, a broader privilege may be applicable to an attorney who has the duty to zealously represent his or client and against whom sanctions, including CR 11 sanctions, may be available. This case does not deal with the statements or conduct of an attorney during a judicial proceeding and we make no comment as to the application of any privilege that may be applied to an attorney.

tions in the complaint, did the trial court properly deny the appellants' motion to dismiss? First, we make a threshold inquiry regarding this Court's jurisdiction.

■ Generally, because the denial of a motion to dismiss is interlocutory in nature, it is not a final and appealable order. However, an exception to the finality rule has been recognized in the realm of absolute governmental immunity and qualified official immunity. The rule and its logic were explained in *Breathitt County Bd. of Educ. v. Prater*, 292 S.W.3d 883, 886–87 (Ky.2009):

> Obviously such an entitlement cannot be vindicated following a final judgment for by then the party claiming immunity has already borne the costs and burdens of defending the action. For this reason, the United States Supreme Court has recognized in immunity cases an exception to the federal final judgment rule codified at 28 U.S.C. § 1291. In *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court reiterated its position that the denial of a substantial claim of absolute immunity is an order appealable before final judgment. We find the Supreme Court's reasoning persuasive, and thus agree with the Court of Appeals that an order denying a substantial claim of absolute immunity is immediately appealable even in the absence of a final judgment. (internal quotation marks and citations omitted).

■ In *Morgan & Pottinger, Attorneys, P.S.C. v. Botts*, 348 S.W.3d 599, 601 (Ky. 2011), the Court extended the exception to claims of immunity under the judicial statements privilege. We adhere to this proposition and consider the merits of this appeal but do so with reservation for the reason we are without the benefit of a developed factual record. Nevertheless, we address the issue of the judicial state-

ments privilege. It is a question of law. *Id.*

■ The judicial statement privilege is one that has been long adhered to in this jurisdiction and is rooted in public policy "which looks to the free and unfettered administration of justice, though, as an incidental result, it may, in some instances, afford an immunity to the evil-disposed and malignant slanderer." *Schmitt v. Mann*, 291 Ky. 80, 163 S.W.2d 281, 284 (1942) (quoting *Bartlett v. Christhilf*, 69 Md. 219, 14 A. 518, 520 (1888)). Although sometimes referred to as providing immunity from civil suit, to say the speaker is immune from civil liability is a misnomer. As its name implies, it is a privilege and, therefore, precludes the use of those privileged communications to sustain a cause of action. It does not bar the cause of action but only renders it unsustainable if based exclusively on statements privileged under the law. Generally stated, it affords an absolute privilege to statements made "preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of a judicial proceeding" and that have "some relation to a proceeding that is contemplated in good faith and under serious consideration." *Rogers v. Luttrell*, 144 S.W.3d 841, 843–44 (Ky.App.2004) (quoting *General Electric Co. v. Sargent & Lundy*, 916 F.2d 1119, 1127 (6th Cir.1990)). It applies with equal force to statements in pleadings filed in judicial proceedings. *Massengale v. Lester*, 403 S.W.2d 701–02 (Ky.1966).

As new torts derivative of defamation have emerged, some jurisdictions have expanded the privilege. *See Simms v. Seaman*, 308 Conn. 523, 566, 69 A.3d 880 (2013). The prevailing thought when expanding the privilege to torts other than defamation is explained in *Hoover v. Van Stone*, 540 F.Supp. 1118, 1124 (D.Del.1982) (quoting *Rainier's Dairies v. Raritan Val-*

*ley Farms,* 19 N.J. 552, 117 A.2d 889, 895 (1955)):

> If the policy, which in defamation actions affords an absolute privilege or immunity to statements made in judicial and quasi-judicial proceedings is really to mean anything then we must not permit its circumvention by affording an almost equally unrestricted action under a different label.

However, as the Tennessee Supreme Court in *Brown v. Birman Managed Care Inc.,* 42 S.W.3d 62, 72 (Tenn.2001), observed, the expansion of the privilege "comes at a cost."

> Indeed, any privilege of general application protects those who deserve it, as well as those who do not. This fact explains why, despite a general acceptance of the common law privilege, there is debate in the case law over its proper contours. For instance, some would restrict the privilege to its early roots in the context of defamation law, while others advocate a more expansive application.

*Id.* at 72–73 (internal citations, quotations and parenthetical information omitted).

Little has been written in Kentucky regarding the scope of the privilege beyond defamation actions. *See e.g. Smith v. Hodges,* 199 S.W.3d 185 (Ky.App.2005) (and cases cited therein); *Rogers,* 144 S.W.3d 841; *Massengale,* 403 S.W.2d 701; *Schmitt,* 291 Ky. 80, 163 S.W.2d 281; *Lisanby v. Illinois Cent. R. Co.,* 209 Ky. 325, 272 S.W. 753 (1925). However, our review of the two most recent Kentucky cases lead us to conclude the judicial statements privilege, although vital to the administration of justice, should not be an exception to the general rule that privileges are to be narrowly construed. *O'Connell v. Cowan,* 332 S.W.3d 34, 39 (Ky.2010). Consequently, we hold the privilege is only applicable to communications and has no application

where it is alleged the conduct of the tortfeasor serves as the basis for the claim.

The most recent case from our Supreme Court to discuss the scope of the judicial statements privilege is *Ballard v. 1400 Willow Council of Co–Owners, Inc.,* 430 S.W.3d 229 (Ky.2013). In that case, the Court had the opportunity to follow the majority of jurisdictions and apply the judicial statements privilege to statements contained in a *lis pendens. Id.* at 237–38. Rejecting the majority view, the Court held the filer was entitled only to a qualified privilege. Instead of expanding the privilege, it balanced the interest of the creditor and those of the landowner to be free from defamation and recourse when her property has been disparaged by the "unfounded and malicious publication of another." *Id.* at 238–39 (quoting *Warren v. Bank of Marion,* 618 F.Supp. 317, 325 (W.D.Va.1985)). Notably, it was not the act of filing the *lis pendens* that was the basis for the slander of title action but the knowingly and maliciously *communication* of a false statement. *Id.*

*Morgan & Pottinger,* 348 S.W.3d 599, relied upon by appellants and, although distinguishable, nevertheless lends insight into whether conduct is privileged or, as it name implies, the judicial statements privilege is limited to communications. Unfortunately for appellants, our understanding of the Court's reasoning does not lead to the favorable conclusion they desire.

In *Morgan & Pottinger,* after a Kentucky Bar Association (KBA) disciplinary complaint was filed against an attorney, the attorney filed an action alleging wrongful use of civil proceedings, defamation and slander, abuse of process, fraud, and outrageous conduct against the complainant and its attorney who filed the disciplinary complaint. Among their reasons for dismissal of all causes of action asserted, the complainant and its attorney argued they

were immune from suit pursuant to the judicial statements privilege. *Id.* at 601.

First, the Court addressed whether *statements* made preliminary to, or in the institution of, or during the course of an attorney disciplinary proceedings are privileged if material, pertinent and relevant to such proceeding. Holding a KBA disciplinary proceeding is a judicial proceeding, the Court concluded such statements are privileged. *Id.* at 602. However, a second issue, and one the Court found more problematic, was whether the privilege applied to allegations of wrongful use of civil proceedings, abuse of process, fraud, and outrageous conduct. As phrased by the Court, whether claims based not only on statements contained in the KBA complaint, but also on the *act* of filing the complaint, posed a "larger question." *Id.* at 603.

Although the Court held the privilege applied, its reasoning was premised on the nature of an attorney disciplinary proceeding. It noted a layperson is not expected to "understand the subtle legal difference between an allegation of defamation versus a claim of abuse of process." *Id.* at 605. Further, the Court stressed its decision would encourage people with complaints against attorneys to submit information to the KBA. Finally, the Court noted its holding would not unduly burden attorneys or abrogate any right to seek redress. *Id.* Ultimately, the decision to afford absolute immunity to KBA complainants for the act of filing the complaint was premised on the notion that "one who elects to enjoy the status and benefits as a member of the legal profession must give up certain rights as causes of action...." *Id.* (quoting *Stone v. Rosen*, 348 So.2d 387, 389 (Fla.App.1977)).

We conclude the Court did not intend its reasoning to extend the privilege to acts other than disciplinary complaints filed with the KBA. In her extensive dissent, Justice Noble astutely pointed out that it would be incongruous to say the Court extended the judicial statements privilege to conduct and a stark deviation from the traditional rule that the judicial statements privilege "can apply only when the claims stems from the statements made in judicial proceedings[.]" *Id.* at 607 (Nobel, J. dissenting).

With this admittedly shallow legal background and the caveat the privilege does not apply to conduct, we individually address the claims presented. We begin with abuse of process.

In the few Kentucky cases applying the judicial statements privilege outside defamation actions, it has been applied to actions for malicious prosecution based on the allegation that a witness lied to a grand jury to secure an indictment. *Reed v. Isaacs*, 62 S.W.3d 398 (Ky.App.2000). The strong public policy for encouraging witnesses to crimes to come forward without fear of retaliation in the form of a civil lawsuit is undoubtedly furthered by such an application.

■ However, abuse of process differs from malicious prosecution in significant ways. Quoting Prosser on Torts (3d ed.), § 115, 876–77, the Court in *Flynn v. Songer*, 399 S.W.2d 491, 494 (Ky.1966), highlighted the distinctions:

Abuse of process differs from malicious prosecution in that the gist of the tort is not commencing an action or causing process to issue without justification, but misusing or misapplying process justified in itself for an end other than that which it was designed to accomplish. The purpose for which the process is used, once it is issued, is the only thing of importance. * * * The improper purpose usually takes the form of coercion to obtain a collateral advantage, not

properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort.

Unlike malicious prosecution, at the core of abuse of process is the improper use of judicial proceedings and the defendant's motive for using the *process* rather than the *statements* made during the course of a judicial proceeding.

In *Baglini v. Lauletta*, 315 N.J.Super. 225, 717 A.2d 449 (Law Div.1998), the Court expressed the sound reasoning that it would not further the legitimate purposes of the privilege to apply it to abuse of process. "[A]n abuse of process claim is inherently inimical to a litigation privilege and taken to its logical extreme, could emasculate the tort entirely." *Id.* at 239, 717 A.2d at 456. "Accordingly, when allegations of misconduct properly put an individual's intent at issue in a civil action, statements made in judicial proceedings may be used for evidentiary purposes in determining whether an individual acted with the requisite intent." *Id.* at 238, 717 A.2d at 455–56. The Court held that the defendant's statements in depositions in the underlying action and statements made during settlement negotiations were admissible at trial in the abuse of process action as evidence of 'further acts' to support the plaintiffs' abuse of process claim. *Id.* at 239, 717 A.2d at 456. *See also MacDermid, Inc. v. Leonetti*, 310 Conn. 616, 629, 79 A.3d 60, 68–69 (2013) (noting the distinction "between attempting to impose liability upon a participant in a judicial proceeding for the words used therein and attempting to impose liability upon a litigant for improper use of the judicial

system itself" and holding the privilege is not applicable to abuse of process).

■ We likewise conclude the judicial statement privilege has no application to abuse of process claims. However, the remaining torts, interference with business relations and fraud in the inducement, are more akin to defamation actions and compel a different application of the privilege.

■ Unlike abuse of process claims, intentional interference with business relations and fraud in the inducement are not necessarily based on the tortfeasor's abuse of the judicial process. Tortious interference with business relations requires: (1) the existence of a valid business relationship or expectancy; (2) that the defendant was aware of this relationship or expectancy; (3) that the defendant intentionally interfered; (4) that the motive behind the interference was improper; (5) causation; and (6) special damages. *Monumental Life Ins. Co. v. Nationwide Retirement Solutions, Inc.*, 242 F.Supp.2d 438, 450 (W.D.Ky.2003).

■ In *Gray v. Central Bank & Trust Co.*, 562 S.W.2d 656, 658 (Ky.App.1978), the Court held "any privilege conferred by statute applies equally to actions founded upon defamation and to actions founded upon the tort of interference with prospective economic relations." In doing so, it made the following observation: "There has been considerable dispute concerning whether the alleged defamation and interference with prospective contractual relationships were separate causes of action[.]" *Id.* at 657. The Court noted the tort is within the same genre as defamation:

Prosser, in his treatise, Law of Torts, 4th Edition, Chapter 25, Section 130, at page 926 states:

Defamation, interference with contract, injurious falsehood, and the broader tort of interference with prospective

economic relations, are all different phases of the same general wrong of depriving the plaintiff of beneficial relations with others ... the greatest protection is given to personal reputation, and existing contracts, the least to competitive interest in future advantage ...

At page 924, Prosser further states:

In general, it may be said that injurious falsehood which is a tort that never has been greatly favored by the law, is subject to all of the privileges recognized both in cases of personal defamation and in those of other types of interference with economic advantage. The question of absolute privilege to disparage in judicial, legislative, and executive proceedings has seldom arisen, except in connection with pleadings, motions, and the like in the course of litigation, where it has been recognized.

On page 953 in ff. 97, Prosser further states:

Although there are almost no cases, it appears that the absolute privileges in defamation will be available as a defense here. (cases of interference with prospective economic relations.)

*Id.* at 657–58. Based on *Gray,* we conclude the judicial statements privilege is applicable to claims for tortious inference with business relations and, therefore, any statements made preliminary to, or in the institution of, or during the course of litigation that were material, pertinent and relevant to such litigation cannot be used to support the claim.

We also believe the privilege applies to claims of fraud. "In Kentucky, a party claiming harm resulting from fraud in the inducement must establish six elements of fraud by clear and convincing evidence as follows: a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and

f) causing injury." *Bear, Inc. v. Smith,* 303 S.W.3d 137, 142 (Ky.App.2010).

While there is no Kentucky law addressing the application of the privilege to fraud, in *Heavrin v. Nelson,* 384 F.3d 199 (6th Cir.2004), the Court considered whether, under Kentucky law, the judicial statements privilege is applicable. Noting the privilege had been extended to causes of action other than defamation, the Court held any statements made in pleadings filed in a bankruptcy proceeding could not be the basis for a claim of fraud. *Id.* at 202.

We likewise conclude statements made preliminary to, or in the institution of, or during a judicial proceeding cannot be the basis for fraud in the inducement. Defamation and fraud based on statements made preliminary to or during a judicial proceedings "contemplate allegations that a party suffered harm because of a falsehood communicated" by the defendant, "namely, the publication of a false statement that harms the other party's reputation in the case of defamation, and a false representation made as a statement of fact that induces the other party to act to his detriment in the case of fraud." *Simms,* 308 Conn. at 548, 69 A.3d at 894. The Connecticut Supreme Court noted:

Commentators have observed that, "because the privilege protects the *communication,* the nature of the theory [on which the challenge is based] is irrelevant." (Emphasis added.) 3 R. Mallen & J. Smith, Legal Malpractice (2010) § 22:8, pp. 185–86; accord P. Hayden, supra, 54 Ohio St. L.J. at 998. Accordingly, because the communication of a falsehood is an essential element of both defamation and fraud, the litigation privilege provides a complete defense to both causes of action. See 3 R. Mallen

& J. Smith, supra, § 22:8, at pp. 186–87[.]

*Id.* at 548–49, 69 A.3d at 894. Just as the defenses applicable to defamation shield the speaker from liability for defamation, the judicial statements privilege shields the speaker from claims for fraud in the inducement based on statements made preliminary to, or in the institution of, or during a judicial proceeding if those statements were material, pertinent, and relevant to the judicial proceeding.

■■■ The final and ultimate question is whether the trial court properly denied appellants' motion to dismiss all tort claims based on the judicial statements privilege. Even with only the appellees' allegations as our historical map of this litigation, it is apparent that the parties have had a turbulent and lengthy business relationship and equally lengthy and turbulent court battles. As appellees point out, allegations in their voluminous complaint and amended complaint include references to statements made outside of, prior to, and after the various judicial proceedings and, therefore, fall outside the privilege. The appellees further allege non-communicative conduct not protected by the privilege in any tort action. Therefore, we hold the trial court properly denied the appellants' motion to dismiss and, affirm.

On remand, perhaps upon motion for summary judgment or a motion in limine, the trial court will be asked to analyze the application of the judicial statements privilege to particular communications made in prior litigations. For the trial court's and the parties' benefit in what could be a prolonged and tenacious litigation, we summarize our holding. First, the judicial statements privilege does not apply to conduct. Second, it has no application to abuse of process claims. Third, the privilege applies to interference with business relations and fraud in the inducement to the extent the claims rely on communications made preliminary to, or in the institution of, or during the course of a judicial proceeding. Additionally, it applies only if those communications were material, pertinent and relevant to the judicial proceeding. *Morgan & Pottinger*, 348 S.W.3d at 602.

Based on the forgoing, the order denying appellants' motion to dismiss is affirmed.

STUMBO, JUDGE, CONCURS.

TAYLOR, JUDGE, CONCURS IN RESULT ONLY.