NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0064n.06

No. 22-5788

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

JEFF RIECK,

     Plaintiff-Appellant,

v.

HOUSING AUTHORITY OF COVINGTON;
BOARD OF COMMISSIONERS, HOUSING
AUTHORITY OF COVINGTON; JOSEPH U.
MEYER; SHAWN MASTERS; JENNIFER
HOLT; JENNIFER RAWERS; TODD
VANDERVEER MCMURTRY, as
representative for the estate of Stephen T.
McMurtry; QUINN MCMURTRY, as
representative for the estate of Stephen T.
McMurtry,

     Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Feb 12, 2024
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF KENTUCKY

OPINION

Before: WHITE, STRANCH, and NALBANDIAN, Circuit Judges.

HELENE N. WHITE, Circuit Judge. Plaintiff-Appellant Jeff Rieck challenges multiple rulings of the district court in favor of Defendants-Appellees—the Housing Authority of Covington (the "HAC"); the HAC Board of Commissioners, collectively and in their individual capacities; and the estate representatives for Stephen McMurtry, the HAC's former attorney—in this action arising from the termination of Rieck's employment as the HAC's executive director. We AFFIRM.

## I. Facts

### A. The HAC and Jeff Rieck

The HAC provides and administers public and subsidized housing in Covington, Kentucky. Although the agency must follow regulations promulgated by the Department of Housing and Urban Development ("HUD"), it is governed locally by a five-member board of commissioners (the "Board"). Covington's mayor serves as an ex officio member and appoints the Board's four remaining members when vacancies arise.

In 2014, when Sherry Carran was mayor of Covington, the Board hired Rieck as its executive director on a five-year contract. Two years later, Joseph Meyer defeated Carran in Covington's mayoral election, replacing her on the Board. Meyer's campaign highlighted his intent to change the city's public-housing policy.

### 1. Growing Tension and HAC Finances

Meyer took office in January 2017 and immediately instructed Rieck to stop filling units at City Heights—a deteriorating, 750-person public-housing structure—because Meyer hoped to close the development within eighteen months. Rieck disagreed with the directive and alleges that Meyer, in response, "got in [his] face" and came across as "a little bit abusi[ve]." R. 106, PID 1759–60. Former Board Chair Jennifer Allen, an ally of Rieck's, agreed with the characterization, claiming that Meyer was "abusive" and had called City Heights a "cesspool." *Id.*

The problems escalated from there. Over the next eighteen months, Rieck opposed numerous Board decisions and directives. For example, the Carran administration had allegedly promised a $1 million grant to the HAC, and Rieck invoiced the city for that amount on the penultimate day of her term. The city—with Meyer now the mayor—never paid, and Rieck urged

the HAC to take legal action to obtain the funds. The Board disagreed and refused to pursue the grant further.

In 2017, the HAC lost three of its finance-department employees. First, the finance director retired. Then, the assistant finance director—the person who would have filled the director vacancy—resigned because Rieck refused him a promotion and raise. The assistant finance director asked to withdraw his resignation and return to his position, but Rieck refused to rehire him. A few months later, the accounts-receivable staffer quit. The department then had only a staff accountant and a temporary finance employee left.

In July 2017, the Board authorized Rieck to enter into an agreement with BDO, a private accounting firm, to help manage the HAC's finances until he hired new staff. Rieck had apparently reached out to BDO earlier that year. The Board authorized Rieck to spend up to $150,000 annually for BDO's financial services.

The BDO funding ran out just three months later. Rieck did not inform the Board and, by December, BDO had invoiced the HAC for more than $205,000. In a meeting the same month, Rieck told the Board that the funding had run out, but he did not disclose the $55,000 cost overrun. *Id.* The Board allocated $60,000 to fund BDO for the next three months, not knowing that the funding would cover only the existing invoices.

In January 2018, Rieck asked the Board to increase funding for BDO by an additional $150,000, to a total of $360,000. Meyer asked Rieck why he had not filled the vacant finance positions yet and why it was so expensive to fill the gap left by three employees. In explaining the funding request, Rieck cited the "difficulty in hiring HAC finance staff, finance salaries underfunded by HUD, nuances in HUD requirements, and how HAC is advertising job openings." *Id.* at 1763. The Board ultimately approved the funding request.

3

At a February 2018 Board meeting, Rieck chastised Meyer for comments about City Heights he had made the year before, calling them demeaning to HAC's residents and contrary to the agency's mission. At the next Board meeting in March, an HAC staff member read a letter expressing concern that the Board did not adequately support the HAC's mission or its staff.

Rieck and Allen maintain that Meyer became increasingly combative at the early 2018 Board meetings. Specifically, they claim that Meyer (1) "once crushed a water bottle loudly during a meeting, wringing it noisily with his hands," (2) "would get red in the face when presented with any sort of opposition," (3) "would scoot his chair loudly so as to garner attention and passive-aggressively express his displeasure," (4) "at least once . . . looked at [Rieck] in such a way that [Rieck] felt physically threatened," and (5) "created a hostile and combative work environment." *Id.* at 1764.

## 2. Board Appointment Controversy

When a Board vacancy arose in April 2018, Meyer appointed Shawn Masters. Rieck and Allen protested that Masters's appointment was illegal because Kentucky law prohibited more than two appointees of the same political party to serve on a city housing authority. With Masters's appointment, three of the Board's five members would be Democrats.

At the May Board meeting, Allen raised the issue of partisanship again. Commissioner Holt, one of the three Democrats, left the room for a few minutes to change her party affiliation to "Independent." Stephen McMurtry, the Board's attorney, believed the change was sufficient to cure any legal defect, but Rieck and Allen believed that Masters could not serve on the Board because his appointment violated Kentucky law at the time it was made.

A week later, the Board held a special session to elect a new chair to replace Allen. Rieck did not attend—he claims that he took sick leave—and Allen left early in protest, but the three

4

remaining members elected Meyer as chair and Masters as vice-chair. Rieck and Allen continued to be uncooperative because they viewed the Board's composition, and thus its directives, as illegal.

On June 19, 2018, the city of Covington sued the HAC in state court to compel recognition of the Board's legitimacy and compliance with its directives. At a hearing the next day, which Rieck did not attend because he was on paid leave, the city obtained a temporary restraining order requiring all individuals affiliated with the HAC to recognize the Board's legitimacy and comply with its orders. Rieck argued that the order was invalid because he had no way to represent himself at the hearing.

Also on June 20, 2018, the Board held its June meeting. Rieck and Allen failed to attend. Rieck claimed that he was still on a paid leave that Allen had approved weeks earlier, but he did not inform the other Board members that he would be absent.

Two days later, McMurtry—the Board's attorney—called Rieck and expressed the Board's willingness to continue working with him, despite philosophical differences concerning the HAC's direction. Rieck responded that the Board members could speak to him while he was at work or could call on his personal cell phone. Meyer then emailed Rieck, accusing him of being deliberately nonresponsive toward the Board. In response, Rieck expressed a willingness to work together, but stood firm in his view that he was only willing to work in a way that advanced his interpretation of the HAC's mission. Rieck also refused to meet alone with Meyer without Allen being present, apparently because he refused to recognize Meyer's election as the Board's chair.

### 3. Termination and Aftermath

In July 2018, Rieck issued a request for proposal ("RFP") for the position of Board attorney. The Board believed Rieck's RFP violated the agency's procurement policy, which

required Rieck to obtain Board approval before awarding contracts in excess of $20,000. At that point, the Board began taking steps to terminate Rieck's employment. McMurtry emailed Rieck on July 17, 2018, to give him an opportunity to negotiate a settlement and resign voluntarily before termination, but there was no evidence that Rieck responded, nor does Rieck claim that he attempted to resign voluntarily. The next day, the Board passed a resolution to suspend Rieck without pay and notified him of its intent to terminate his employment for cause.

Shortly after, McMurtry accepted an interview request from the River City News, a local publication, to discuss the Board's intent to terminate Rieck's employment. In the interview, McMurtry said that Rieck's dismissal was for cause due to a "a long list" of reasons, including "failures to cooperate with the board, to bring certain items to the board's attention, to deliver reports, [and] to provide discussions to the board." R. 38-6, PID 229. He further said that the for-cause dismissal was appropriate because "the job was not getting done." *Id.*

In September, the Board officially terminated Rieck's employment. Rieck could have challenged his termination for cause, but he waived his post-termination hearing.

In October 2018, the HAC Board submitted an eleven-page report to HUD detailing numerous reasons for its termination of Rieck's employment, among them that Rieck (1) mismanaged the finance office and failed to adequately inform the Board of the cost overruns with BDO, (2) violated the procurement code by failing to prepare the proper paperwork and specify deliverables from the BDO contract, (3) improperly agreed to pay BDO in excess of the amount authorized by the Board, (4) failed to quickly hire and train new finance employees, (5) failed to develop a required transition plan to move the finance work back from BDO to the HAC, (6) attempted to conceal BDO cost overruns from the Board by moving payments from the general fund to the capital fund, (7) used public resources for the benefit of private entities in

violation of the law, (8) sought credit for annual leave in excess of what his contract allowed, (9) failed to attend and prepare for Board meetings, and (10) failed to perform required audits and other administrative functions, imperiling the renewal of mortgages on public-housing facilities.

## B. Procedural Background

In July 2019, Rieck filed this action, asserting three claims: First Amendment retaliation, tortious interference with prospective employment, and defamation. In November of the same year, Rieck filed an amended complaint, adding a breach-of-contract claim.

McMurtry moved to dismiss the defamation and tortious interference claims, which stemmed from his interview with the River City News. The district court partially granted the motion by dismissing the tortious interference claim but ordered limited discovery on the defamation claim. Following discovery, McMurtry filed a motion for summary judgment on the defamation claim. The district court granted the motion, concluding that McMurtry's statements could not be defamatory because they were true. In dismissing both the defamation and tortious interference claims, the court effectively removed McMurtry as a defendant.[1]

The remaining defendants moved for summary judgment on the First-Amendment-retaliation and breach-of-contract claims, and the district court granted the motion.

Rieck appeals.

## II. Standard of Review

The district court disposed of Rieck's tortious interference claim on a motion to dismiss, which we review de novo. *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 433 (6th Cir. 2008). In reviewing a motion to dismiss, a court must "construe the

---

[1] Because Stephen McMurtry passed away in the pendency of this litigation, Todd and Quinn McMurtry—co-executors of Stephen McMurtry's estate—were substituted as defendants.

complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, 974 F.3d 756, 758 (6th Cir. 2020) (quoting *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008)). Although "detailed factual allegations" are unnecessary, a complaint must contain "sufficient factual matter, [if] accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint is insufficient if it makes only "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678. To defeat a motion to dismiss, the plaintiff must present "direct or inferential allegations" for each element of the claim. *Phila. Indem. Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645, 649 (6th Cir. 2013) (quoting *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 276 (6th Cir. 2010)).

The district court dismissed the remaining three claims on motions for summary judgment. This court reviews summary judgment orders de novo. *Fortney & Weygandt, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 595 F.3d 308, 310 (6th Cir. 2010). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Even if certain facts are disputed, summary judgment should be granted if there is a "complete failure of proof concerning an essential element" of the nonmoving party's case. *Id.* at 322–23. In resolving a summary judgment motion, courts must view the evidence in the light most favorable to the nonmoving party and make all reasonable inferences in their favor. *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 150–51 (2000). A court should not grant summary judgment if a reasonable juror could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III. Analysis

## A. Tortious Interference Claim

A claim of tortious interference under Kentucky law requires a showing of six elements: (1) the existence of a valid business relationship or expectancy, (2) the defendant's knowledge of the business relationship or expectancy, (3) the defendant's intentional interference with that relationship, (4) the defendant's improper motive, (5) causation, and (6) special damages. *Halle v. Banner Indus. of N.E., Inc.*, 453 S.W.3d 179, 187 (Ky. Ct. App. 2014). A defendant acts with an "improper motive" when he engages in significantly wrongful conduct without justification. *PBI Bank, Inc. v. Signature Point Condominiums LLC*, 535 S.W.3d 700, 723 (Ky. Ct. App. 2016). If a defendant shows that he acted in good faith to protect a legally protected interest, the defendant may not be held liable. *NCAA By & Through Bellarmine Coll. v. Hornung*, 754 S.W.2d 855, 858 (Ky. 1988).

The district court properly dismissed Rieck's tortious interference claim because his complaint failed to make "direct or inferential allegations" for several elements essential to his claim. *Phila. Indem. Ins. Co.*, 732 F.3d at 649 (quoting *Terry*, 604 F.3d at 275–76). For example, the first element requires Rieck to plead the existence of a valid job opportunity—but he did not identify a single job he could have obtained, much less one he sought. The second and third elements require a plaintiff to show that the defendant both *knew* about and deliberately interfered with a specific business relationship. *Halle*, 453 S.W.3d at 187. But no part of the complaint alleged that McMurtry knew about any specific job opportunity, much less that he intentionally interfered with it. The assertion that an unknown potential future employer could find McMurtry's interview through a Google search is insufficient to adequately plead the elements of a tortious-interference claim.

Rieck argues that it is McMurtry's burden to acquire the missing information through discovery, rather than his own duty to include the details in his complaint. But it is not McMurtry's duty to make Rieck's claim for him. Rieck must plead sufficient factual matter, that accepted as true, supports each element of his claim. *See Philadelphia Indem. Ins. Co.*, 732 F.3d at 649. Rieck has not met his burden here.

### B. Defamation

A defamation claim in Kentucky requires proof of the following elements: (1) "a false and defamatory statement concerning another," (2) "an unprivileged publication to a third party," (3) "fault amounting at least to negligence on the part of the publisher," and (4) "either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276, 282 (Ky. 2014) (footnote omitted) (quoting Restatement (Second) of Torts § 558 (1977)). The district court granted McMurtry's motion for summary judgment on the defamation claim because it determined that McMurtry's statements to the media were true.

Rieck disagrees, alleging that McMurtry made several false statements. First, Rieck argues that it was false to classify his dismissal as a termination "with cause." Although Rieck had received notice of the Board's intent to terminate him at the time of the interview, the Board had not yet followed through. The Board would only officially terminate Rieck two months later. Because Rieck's employment was not yet formally terminated, Rieck argues that a jury could determine that the statement was false at the time it was made.

Rieck omits crucial facts. Although McMurtry did classify Rieck's termination as "with cause," he included a caveat: McMurtry told the River City News that the Board was still in the early stages of the termination process and that Rieck was still entitled to a termination hearing.

McMurtry spoke truthfully:  The Board *had* initiated termination proceedings against Rieck for cause.

Rieck also alleges that McMurtry made false statements when he said that the termination was for "a long list" of reasons, including "failures to cooperate with the board, to bring certain items to the board's attention, to deliver reports, [and] to provide discussions to the board." Appellant's Br. 76.  But McMurtry made clear that the stated reasons came from the Board's notice to terminate Rieck's employment, rather than from his own assessment.  McMurtry did not make accusations independently; he simply repeated the reasons given by the Board, and Rieck admits as much.

Rieck argues that McMurtry had a duty to investigate and verify each of the Board's reasons before repeating them.  However, a plaintiff cannot recover for defamation when an individual accurately reports on an "official action" or a meeting open to the public on a matter of public concern.  *See* Restatement (Second) of Torts § 611 (1977); *see, e.g.*, *Pearce v. Courier-J.*, 683 S.W.2d 633, 636 (Ky. Ct. App. 1985) ("Insofar as this article is an accurate account of judicial and administrative proceedings, then regardless of the falsity or defamatory character of its contents, it is absolutely privileged unless its publication 'was maliciously made.'" (quoting KRS § 411.060)).  McMurtry's statements were substantially true because they accurately recounted the Board's actions.

Because truth is a complete defense to defamation, Rieck cannot meet the first element of his claim.  *See Toler*, 458 at 289 n.55.  Accordingly, we affirm the district court's grant of summary judgment on the defamation claim.

## C. First Amendment Retaliation

Rieck alleges that Defendants violated the Constitution by terminating his employment in retaliation for his protected speech. The district court granted summary judgment to Defendants because it determined that Rieck's speech was not protected by the First Amendment under the *Pickering* balancing test. *See Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty*, 391 U.S. 563 (1968).

### 1. Rieck's Speech

In his complaint, Rieck did not quote or specify the speech at the core of his retaliation claim. Instead, Rieck alleged that he was terminated in response to his "advocacy for public housing and the mission of HAC; [opposition to] the City's failure to support public housing and provide funds for HAC; and . . . opposition to Defendant Meyer's attempt to operate HAC in violation of the law and contrary to the mission of HAC." R. 17, PID 45.

Rieck added more specificity in his district court briefs. Rieck's allegedly protected speech included: (1) his view that Masters's appointment to the Board and the subsequent Board election was illegal under Kentucky law; (2) his repeated statements at Board meetings opposing Meyer's purportedly anti-public-housing policies; (3) his statements alleging that the Board was tyrannical, corrupt, or Meyer's puppet; (4) his statements alleging that Meyer's directives violated federal housing law; (5) his views that the Board's new policies were potentially discriminatory; and (6) other criticism toward Meyer and the Board.[2]

---

[2] For example, Plaintiff wrote to Meyer in an email: "[I]t is suspect that under your 'leadership' that anything positive or possibly even legal or nondiscriminatory will happen with public and affordable housing in Covington. Your perceived hatred for public housing staff and residents and disdain for the housing authority is evident in your actions and comments to some staff, residents, and community members. Many comment about it. Many Golden Towers residents attending board meetings recently have been appalled by your behavior and the behavior of those board members aligned with you." R. 94, PID 1489.

For the purpose of its analysis, the district court divided Rieck's speech into two categories: (1) speech regarding the Board's composition, appointments, and legal legitimacy, and (2) speech disagreeing with the HAC's policies, operation, and directives.[3] The parties make their arguments in the context of these two categories, and we will address them in this manner as well.

## 2. Employee Speech

Normally, a First-Amendment-retaliation claim under Section 1983 requires a plaintiff to establish three elements: (1) the individual engaged in constitutionally protected speech or conduct, (2) an adverse action was taken against the plaintiff that would deter a reasonable person from continuing to engage in that protected activity, and (3) there was a causal connection between the first two elements—that is, the adverse action was "motivated at least in part by [the] protected conduct." *Dixon v. Univ. of Toledo*, 702 F.3d 269, 274 (6th Cir. 2012) (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)). Generally, these factors involve fact-based determinations best left to a jury. *See Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002).

In a retaliation claim against a public employer, however, a plaintiff must meet additional requirements. *See Pickering*, 391 U.S. at 568; *Connick v. Myers*, 461 U.S. 138, 145 (1983). In such cases, a plaintiff must show that (1) the speech touched on a matter of "public concern," (2) the plaintiff spoke as a private citizen rather than in an official capacity, and (3) the plaintiff's constitutional interests outweighed the employer's interest in efficiently delivering public services.

---

[3] The statements in this category included more than mere policy disagreements. At points, Plaintiff accused Meyer of harassment, threats, and abuse. *See, e.g.*, R. 94-2, PID 1554 ("More than 2 months ago I had complained to the City of Covington regarding what I perceived as your harassment, intimidating, threatening, and bullying behavior towards me. ZERO response from the City to date."). Rieck also alleged that Meyer acted in a discriminatory fashion toward public housing residents.

*Mayhew v. Town of Smyrna, Tenn.*, 856 F.3d 456, 462 (6th Cir. 2017) (quoting *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 337 (6th Cir. 2010)).

### 3. Private Citizen or Official Capacity

When an individual speaks "pursuant to their official duties," they are not protected by the First Amendment. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). However, an individual does not speak as an employee simply because their speech is related to information they acquired in the course of public employment. *Lane v. Franks*, 573 U.S. 228, 240 (2014). In fact, the Supreme Court has recognized that speech from public employees holds "special value" because it is developed through extensive experience and expertise with the subject matter. *Id.* The critical question, then, is "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.*

This court has recognized that determining whether an employee speaks as a private citizen or public employee "can be challenging." *Mayhew*, 856 F.3d at 464. Our precedent gives several non-exhaustive factors to consider, including "the speech's impetus; its setting; its audience; and its general subject matter." *Id.* (citing *Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012)). These "'who, where, what, when, why, and how' considerations" help determine whether the speech at issue is ordinarily within the scope of an employee's duties. *Id.*

### a. Statements on the Board's Legal Authority

The district court determined that Rieck acted in his official capacity when he disputed the legality of the Board's appointments and chair election. The district court concluded that Rieck made the statements to ascertain the chain of command and determine to whom he was accountable, rather than making the statements in the public interest. If Rieck were simply trying to figure out his supervisor, his speech would fit within his traditional job duties. Rieck denies the

14

district court's characterization, arguing that his statements were made in the public interest to ensure the agency operated in accordance with the law.

We begin by examining Rieck's formal job description. *See DeCrane v. Eckart*, 12 F.4th 586, 596 (6th Cir. 2021). Rieck's official duties required him to "[m]aintain close personal contact with all of the Commissioners . . . and consult with them on matters of policy, provide data and study materials, explain recommendations[,] and answer questions." R. 76-4, PID 516. In emails he sent to Board members, Rieck made numerous recommendations regarding the Board's compliance with Kentucky law. *See, e.g.*, R. 94-2, PID 1555 ("There is a question as to the legitimacy of the Boards [sic] actions. . . . Jen Allen was legitimately elected Board Chairperson and has been acting in that capacity for some time."). Defendants thus argue that Rieck's speech disputing the Board's appointments and legal authority fell squarely within his job duties.

Rieck disagrees, citing a case from this court holding that "extraordinary rather than everyday communication" is likely to be private speech. *Handy-Clay*, 695 F.3d at 542 (quoting *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 768 (6th Cir. 2010)). Handy-Clay, the plaintiff in that case, raised serious allegations about corruption within her workplace. *Id.* at 542–43. At the time, Handy-Clay worked as a public-records coordinator, not a corruption watchdog or auditor, so the substance of her speech fell outside her standard job duties. *Id.* As a result, even though Handy-Clay's speech was related to her workplace, this court held that she spoke as a concerned citizen rather than in her official capacity. *Id.* Rieck believes his speech is like Handy-Clay's because accusing Meyer and the HAC of violating state law was extraordinary speech and not a normal part of his job responsibilities.

Rieck's argument misses the mark. As the executive director, Rieck was required to provide "recommendations" to the Board on issues related to the HAC. Even irregular guidance

fell within the scope of Rieck's job duties if it effectuated the purpose of furnishing guidance to the Board. Here, Rieck's speech may have been novel and provocative, but it served to inform the Board of Rieck's belief that the HAC was operating in violation of state law. The nature of Rieck's guidance to the Board did not change from professional to personal speech simply because it was unorthodox. This is very different from the speech in *Handy-Clay*, where the employee's speech regarding public corruption fell well outside her duties as a records coordinator. *Id.*

We also consider the audience to which Rieck's speech was directed because "[s]peech outside the chain of command is less likely to be within an employee's ordinary job responsibilities." *Buddenberg v. Weisdack*, 939 F.3d 732, 740 (6th Cir. 2019). In *Handy-Clay*, for example, this court concluded that the employee's speech fell outside her job responsibilities because her statements were made to individuals outside her department and chain of command. 695 F.3d at 542–43.

Rieck argues that this factor weighs in his favor because he sent an email to individuals outside the HAC—including to staff at the city of Covington and HUD—raising his arguments related to the Board's legal compliance. However, the email's recipients *also* included members of the Board—his superiors. This court has previously held that simply adding members of the public as recipients to a message in addition to a supervisor "does not change anything" about the character of the speech. *Keeling v. Coffee Cnty., Tenn.*, 541 F. App'x 522, 527 (6th Cir. 2013). When the primary audience of an employee's speech includes a supervisor, it is likely made in an official capacity. *DeCrane*, 12 F.4th at 596.

Moreover, it was Meyer who added the other individuals to the email chain. Rieck only emailed the outside parties because Meyer wanted to keep them informed in the first place, and

speech made to an outsider at the employer's direction is considered official speech. *See Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 544–45 (6th Cir. 2007).[4]

Finally, we consider the setting in which Rieck made his speech. Here, Rieck's speech came from his official email account, and Rieck admitted in a deposition that at least certain portions of the email chain were work-related. Speech concerning a work-related issue is likely to be part of the employee's official duties when sent from an official email account. *DeCrane*, 12 F.4th at 596. Here, the HAC's legality and legitimacy were a vital work-related issue for Rieck, and he made the statements within the setting of his official email correspondence.

Because Rieck's speech regarding the Board's legal authority fell within his job duties, was made to individuals within his chain of command, and was shared through an official email address, the district court did not err in concluding that Rieck spoke in his official capacity. Consequently, the speech was not protected by the First Amendment.

### b. Policy and Personnel-Related Statements

Rieck made the remaining statements—related to his disagreements with the Board's policies and operation—at Board meetings, from his professional email account, and at other job-related functions. Moreover, he explicitly used avenues available to him only as executive director. For example, Rieck consistently spoke at Board meetings during the designated "Executive Director's Minute," rather than during the public-comment portion. Rieck admitted in testimony that his statements to the Board fell within his job responsibilities, and, when asked to list his *professional* accomplishments, Rieck wrote that he was proud to have taken unpopular

---

[4] Additionally, because Rieck worked under HUD's authority and alongside the city of Covington, the recipients of his email were not truly outsiders or members of the public. Rather, they were individuals with whom Rieck corresponded regularly in his position as director.

positions in support of public housing. On these facts, the district court concluded that Rieck also made the policy-related statements in his official capacity rather than as a private citizen.

Rieck disputes the motives assigned to him by the district court. He argues that many statements he made—for example, those accusing Meyer of harassment and complaining about the Board's lack of support—were not made as part of his job duties. But it is doubtful that Rieck would accuse Meyer of harassment as a member of the public and not as an employee. Indeed, Rieck lodged complaints with the HAC's HR consultant and with HUD officials, both workplace-related entities, which would not have occurred if he simply spoke as a member of the public.[5]

Rieck further argues that the First Amendment protected his speech because, as the executive director, he was in the best position to learn about and speak authoritatively on public issues related to the HAC. *See Lane*, 573 U.S. at 236 ("There is considerable value, moreover, in encouraging, rather than inhibiting, speech by public employees. For '[g]overnment employees are often in the best position to know what ails the agencies for which they work.'" (quoting *Waters v. Churchill*, 511 U.S. 661, 674 (1994) (plurality opinion))).

We appreciate and recognize the value that public employees provide when they speak on matters of public concern in which they have expertise. But accepting that Rieck had a noble intent, the First Amendment protected his speech only to the extent "it would not have been conveyed in [his] capacity as the director." *DeCrane*, 12 F.4th at 598. However, Rieck's statements were not made as a private citizen; rather, he spoke on matters fundamentally

---

[5] Even if Rieck's statements complaining of the Board member's conduct were made in his personal capacity, internal personnel disputes or complaints about an employer's performance are generally not matters of public concern unless they address "actual or potential wrongdoing or any breach of public trust." *See Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001) (citing *Brown v. City of Trenton*, 867 F.2d 318, 322 (6th Cir. 1989), for support, a case where there was no matter of "public concern" where a letter described "the perceptions of six disgruntled police patrolmen that their chief's allegiances were misplaced, that his decisions were inappropriately based on the fear of union retaliation, and that his constant . . . reminders of the money their unit was costing the department [was irritating]").

18

intertwined with his job duties, using his official government-operated email address and the time reserved exclusively to him as the executive director at Board meetings. Rieck's duties required him to advise the Board in various formats, and his use of methods only available to him as the executive director constituted work-related communications. Ultimately, the form of Rieck's speech was just as important as its substance. *See DeCrane*, 12 F.4th at 596; *see also Anderson v. City of Jellico, Tenn.*, No. 21-5704, 2022 WL 1308503, at *3–5 (6th Cir. May 2, 2022) (holding that statements made by police officers during the time reserved to them at city council meetings were made in their professional capacities). And both the form and substance of Rieck's speech effectuated his job duties.

Rieck again argues that his speech was not made in his official capacity because it was far outside the norm usually expected from his position. However, like his speech disputing the Board's legitimacy, Rieck's duty to provide guidance to the Board did not cease simply because the advice was irregular, divisive, or controversial. No matter how unique or novel his views, the responsibility to communicate feedback—policy-related or otherwise—fell squarely within his routine job responsibilities.

We affirm the district court's grant of summary judgment on Rieck's claim of First Amendment retaliation because there is no disputed issue of fact that he spoke in his official capacity as the HAC executive director.[6]

### D. Breach of Contract

Under Rieck's employment contract, the HAC could terminate his employment at any time with or without cause. If terminated without cause, Rieck was entitled to six months' pay and

---

[6] Because Rieck spoke in his official capacity, it is not sufficient that some of his speech touched on matters of public concern.

benefits. Severance pay was not required for termination with cause. The Board could terminate Rieck for cause if it determined, "in its sole discretion," that Rieck had failed to fulfill his employment agreement in one of eleven ways, including: (1) "failure to perform the duties of executive director in a manner satisfactory to the Board," (2) "[i]nsubordination or deliberate refusal to follow the instructions of the Board," (3) "[c]hronic absenteeism," (4) "[a]ctions involving moral turpitude," and (5) "[f]raud, misappropriation, embezzlement, or acts of similar dishonesty." R. 76-3, PID 509.

A report prepared for HUD by the Board provided an extensive list of reasons for Rieck's dismissal and examples of his alleged poor performance. Plaintiff disputes many of the individual reasons given for his termination, arguing that they were "false, exaggerated, or de minimis." Appellant's Reply Br. 19. Defendants argue that even if certain rationales were improper or trivial, their cumulative weight is sufficient to terminate Rieck for cause. We need not adjudicate the merits of each rationale provided for Rieck's dismissal because his mishandling of the HAC's finance department and the BDO contracts are undisputed and sufficient to warrant his termination for cause.

The HAC finance department lost three of its four permanent employees under Rieck's management. In July 2017, the Board authorized Rieck to spend up to $150,000 for a year of BDO's financial services to fill the gap left by the vacancies. Rieck exhausted the allocation in October and, without informing the Board ahead of time, amassed an additional $55,000 in BDO invoices through the end of the year. Not only was Rieck prohibited from executing a contract worth more than $20,000 without the Board's approval, but he failed to inform the Board of the extent of the cost overrun until January 2018. The Board authorized an additional $60,000 for BDO's work in December 2017—intended to last three more months—but it did not know at the

time that Rieck had already exhausted the funding beforehand. In January 2018, Rieck requested, and the Board approved, an additional $150,000, bringing the total funding for BDO up to $360,000. And by March 2018, Rieck requested a further $110,000 to fund BDO's services. Although the last request for funding was not approved by the Board, the expenditures represented a significant sum for an agency with a $5.5 million annual operating budget and only three missing finance employees. Because the HAC's finance department still had only one permanent employee nine months after BDO's contract began, the Board concluded that Rieck had "no strategy to fill out the staff and exit from the BDO and other temp services." R. 76-41, PID 649.

The report further alleged that Rieck violated the procurement policy when he failed to specify deliverables in his agreements with BDO, concealed the sum HAC had paid to BDO by moving the payments from the general fund to the capital fund balance sheet, and used HAC funds to finance BDO's services for private organizations that were associated with the HAC. The report also detailed Rieck's attempt to conceal audits of the HAC and its partner organizations, which uncovered widespread financial problems—including more than $1 million in missing assets. Ultimately, Meyer was forced to utilize an open-records request to obtain the financial documents because Rieck refused to turn them over.

Rieck disputes the HAC's characterization of his conduct, arguing that (1) the Board acknowledged that it should have exercised greater oversight during the BDO ordeal, (2) the Board waited until July 2018 to terminate Rieck's employment, even though it learned about the facts related to the BDO contract months earlier, (3) BDO's contract was partially offset by the money that HAC saved on the salary and benefits of the vacant finance positions, (4) two newly-hired temporary finance employees were on track to become permanent after their probationary period ended, (5) several potential new finance employees quit or refused job offers to work at the HAC,

(6) the Board had visibility into the BDO cost overrun because he provided financial statements to the Board monthly, and (7) there was insufficient proof that Rieck improperly used HAC funds to fund financial consulting services for other entities. For these reasons, Rieck argues that a reasonable jury could determine that his conduct did not warrant termination under his employment contract.

Even when considering the facts in Rieck's favor, several undisputed acts enabled a for-cause termination under his employment contract, including: (1) Rieck authorized an agreement with BDO in excess of $20,000 without Board approval and failed to specify deliverables under a consulting contract, both of which were violations of the procurement policy; (2) Rieck repeatedly refused to turn over financial documents, requiring Board members to file open-records requests to obtain them, and (3) Rieck did not perform required audits from 2015 to 2017 and failed to inform the Board of the deficiency, imperiling the mortgage renewal of an apartment complex.

Under Rieck's contract, the Board could terminate Rieck's employment for cause if it determined, in its "sole discretion," that he had failed to perform his duties in a manner satisfactory to the Board, deliberately refused to follow the Board's instructions, or committed acts of financial dishonesty. Rieck breached each of these provisions. First, Rieck deliberately refused the Board's instructions by refusing to turn over records after they were requested. Second, the Board reasonably determined that Rieck failed to perform his duties in a satisfactory manner because he failed to complete annual audits as required and did not comply with the agency's procurement policy. And third, Rieck's conduct related to the BDO agreement could be reasonably construed by the Board to constitute financial dishonesty. Rieck's arguments attempting to justify or minimize his conduct do not undermine the basic factual predicates undergirding his termination for cause.

22

Finally, Rieck argues that a jury must decide whether his actions justified his termination for cause, rather than a court. However, the "interpretation and legal effect of a contract is a matter of law," not fact. *Cumberland Valley Contractors, Inc. v. Bell Cnty. Coal Corp.*, 238 S.W.3d 644, 647 (Ky. 2007). Although a motion for summary judgment requires us to view the facts in the light most favorable to Rieck, we interpret the provisions of his employment contract de novo. *Id.* The contract's provisions governing for-cause termination encompassed the conduct at issue here. Accordingly, we affirm the district court's grant of summary judgment on Rieck's breach-of-contract claim.

## IV. Conclusion

We AFFIRM the dismissal of Rieck's tortious interference claim and the grant of summary judgment to Defendants on Rieck's claims of First Amendment retaliation, defamation, and breach of contract.