RENDERED: FEBRUARY 16, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

No. 2022-CA-1166-MR

PSC INDUSTRIES, INC.; PMC GLOBAL, INC.;
PHILIP KAMINS; TRAVIS THOMAS; AND
TAMMY FLOWERS                                                  APPELLANTS


|  | APPEAL FROM NELSON CIRCUIT COURT |
| --- | --- |
| v. | HONORABLE JOE G. BALLARD, JUDGE |
|  | ACTION NO. 18-CI-00680 |


GARY L. YOUNG; DEISERRE B. HAWKINS;
VFM, LLC; AND VFM INTERNATIONAL
HOLDINGS                                                          APPELLEES


AND                              NO. 2021-CA-0431-MR


VFM, LLC; VFM INTERNATIONAL, LLC;
GARY YOUNG; AND DEISERRE HAWKINS          CROSS-APPELLANTS


|  | CROSS-APPEAL FROM NELSON CIRCUIT COURT |
| --- | --- |
| v. | HONORABLE JOE G. BALLARD, JUDGE |
|  | ACTION NO. 18-CI-00680 |

PSC INDUSTRIES, INC.; PMC GLOBAL, INC.;
PHILIP KAMINS; TRAVIS THOMAS; AND
TAMMY FLOWERS                                    CROSS-APPELLEES


OPINION AFFIRMING IN PART, VACATING IN PART,
AND REMANDING ON APPEAL NO. 2022-CA-1166-MR
AND AFFIRMING ON CROSS-APPEAL NO. 2021-CA-0431-MR

** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; CALDWELL AND EASTON,
JUDGES.

EASTON, JUDGE:  These appeals follow a jury verdict after an eight-day trial.

The appeal designated as the direct appeal (Case No. 2022-CA-1166-MR) involves

two claims.  The Appellants in that case challenge the liability found and damages

awarded against them for abuse of process.  These Appellants also argue their

opposing claim for breach of fiduciary duty was not time-barred and that the jury

should have awarded more damages to them.  The Cross-Appeal (Case No. 2021-

CA-0431-MR) questions the circuit court's pre-trial dismissal of three counts of

the counterclaim connected to the successful abuse of process claim.  These

Appellants believe the judicial statements privilege should not have been applied

as the basis for the dismissal of those claims.

        After an extensive review of the record, and for the detailed reasons

which follow, we partially affirm and partially vacate and remand on the direct

appeal and affirm on the cross-appeal.  On the direct appeal, we affirm the circuit

-2-

court regarding the statute of limitations ruling barring recovery of the damages awarded on the breach of fiduciary duty claim. We also affirm the jury's award of other damages. We affirm the circuit court's judgment on the abuse of process claim arising from conduct relating to a falsified affidavit, but we vacate that portion of the judgment for abuse of process based separately on the commencement of the litigation. On the cross-appeal, we affirm the circuit court's grant of judgment for PSC on the counterclaims other than the abuse of process.

## FACTUAL AND PROCEDURAL HISTORY

Appellant/Cross-Appellee, PSC Industries, Inc. ("PSC"), is a Louisville-based corporation in the business of fabrication, manufacturing, and industrial packaging of parts for many companies. The area of business particularly relevant to this case involves non-metallic automotive parts. Appellants/Cross-Appellees Travis Thomas ("Thomas") and Tammy Flowers ("Flowers") are PSC's President/CEO and Director of Human Resources, respectively. Appellant/Cross-Appellee PMC Global, Inc. ("PMC") is a privately owned management company, and it owns PSC. Appellant/Cross-Appellee Phillip Kamins ("Kamins") is the CEO and principal owner of PMC.

Appellee/Cross-Appellant, Gary Young ("Young"), was employed with PSC from 1995 until 2016. He held several positions with PSC throughout his years of employment. When he left PSC in 2016, he was the Vice President of

Global Sales and Marketing. Since 2010, Young had been responsible for most of the sales activity for PSC.

Young founded Appellee/Cross-Appellant VFM, LLC ("VFM") in 2003 with Deiserre Hawkins ("Hawkins"). VFM manufactures and supplies various parts used in automobiles. Appellee/Cross-Appellant, VFM International ("VFMI"), is a wholly owned subsidiary of VFM. The primary dispute between the parties is whether VFM was a direct competitor of PSC while Young worked for PSC. A disagreement also arose as to when PSC became aware of Young's activities with VFM.

PSC alleges that Young secretly used PSC's existing customer relationships, business leads, trade secrets, and employees to directly compete with PSC while he was still employed with PSC. Young counters that VFM's business was different from PSC's and that VFM only provided services and parts that PSC did not. Young insists there was never any direct competition. PSC says Young hid the existence of VFM and its business activities from PSC. Young claims he fully disclosed everything in 2011 to PSC's then-CEO and that nothing was ever hidden or secret.

While Young was employed with PSC, he travelled domestically and internationally on PSC's behalf. PSC alleges Young undertook VFM business

while on some of these business trips funded by PSC. Young claims he never did any VFM business while travelling for PSC.

In August 2018, PSC filed a Complaint with a multitude of allegations against Young, Hawkins, VFM, and VFMI (we will usually refer to Young or VFM, the primary business entity). The claims in the Complaint relevant to this appeal include breach of contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, and fraudulent concealment.

Discovery started with substantial disagreements as to what should be protected and what should be disclosed. Eventually, discovery began, and many depositions took place. Both sides filed motions for summary judgment and motions to dismiss. PSC was granted leave to file two amended complaints. The first amended complaint added new causes of action against Young, which included tortious interference with contractual relations and aiding and abetting breach of fiduciary duty. These later allegations pertained to another PSC employee, Matthew Parr ("Parr"). PSC filed an affidavit signed by Parr ("Parr Affidavit") in support of these allegations and in support of a motion for injunctive relief. The circumstances of this affidavit became a significant issue in the lawsuit.

In January 2020, Appellees requested leave to file a counterclaim, which was granted. The counterclaim included four claims. The first claim was soliciting perjury and false swearing against PSC, Thomas, and Flowers. The

second count was bribing a witness, also against PSC, Thomas, and Flowers. Count Three was soliciting perjury and false swearing against PMC and Kamins. These allegations all stem from the Parr Affidavit. The final count was abuse of process, which was filed against all the counterclaim defendants. Appellees alleged that PSC, PMC, and its officers coerced, threatened, and bribed Parr to make a false affidavit to gain an improper advantage in the case and to serve an ulterior purpose.

In August 2020, PSC filed its motion for leave to file its Second Amended Complaint, which was granted. This amended complaint added Charles Damian Osbourne ("Osbourne") as a Defendant. Osbourne was the CEO of PSC in 2011 when Young claims he disclosed his activities with VFM. The relevant claims against Osbourne included breach of fiduciary duty, breach of contract, and fraud by omission. The basis of these allegations is that Osbourne assisted Young in hiding his actions and the competing business of VFM.

Following several motions, the circuit court granted partial summary judgment in favor of PSC on some of the claims in the counterclaim. The court dismissed the two counts of soliciting perjury and false swearing as well as the allegation of bribing a witness. The circuit court reasoned that the judicial statements privilege applied, and PSC and the other related parties could not be held liable on these allegations as a matter of law. The circuit court denied

summary judgment regarding the claim of abuse of process. The court determined a dispute of material fact existed as to that claim, which was not barred by the judicial statements privilege.

The first Notice of Appeal (now considered the cross-appeal) was filed in April 2021. This appeal addressed the circuit court's dismissal of the three counts of the counterclaim. The parties filed a mutual motion to hold that appeal in abeyance pending the resolution of the remaining claims in the case, which was granted. In November 2021, the circuit court granted summary judgment to Hawkins on all claims against her, and thus, she was dismissed as a party. This decision was not appealed.

A jury trial was held on all remaining claims, beginning on June 22, 2022. The testimony was very lengthy. For completeness, we will address the substance of the evidence in detail, which we believe is necessary for a full understanding of what the jury had to consider in this convoluted case. We choose to summarize the evidence in the order it was presented to the jury.

PSC first called Young to testify. After many years of employment, Young left PSC in May 2016. He developed relationships with several customers of PSC over his years as a salesman. For example, Young was the salesman who developed PSC's relationship with Toyota Boshoku America ("TBA"), which

-7-

became PSC's largest automotive customer. The primary buyer Young worked with at TBA was Atsuko Downes ("Downes").

PSC previously supplied flame-laminate[1] products to TBA but quit doing so in approximately 2003. When PSC decided to get out of this business, it had a contract with TBA to supply a specific flame-laminated product. Young said he told management at PSC that stopping this line of business was a bad decision, to no avail. The TBA purchaser then asked Young if he would be able to find someone to provide those products to them. This was the impetus for Young to create VFM.

Young first located a company to immediately supply the needed product to TBA, then he formed VFM with the intention of directly supplying this product to TBA in the future. VFM has conducted this business with TBA since. Young admitted he did not make anyone at PSC aware of VFM when he first started the business.

Young later approached Hawkins with the opportunity to become a co-owner of VFM. Hawkins was herself a business owner. She had experience with bookkeeping and other activities that would be useful for a new business.

---

[1] As the name implies, flame lamination is a process of applying an open flame to certain flexible materials creating a tacky surface for attachment to another material.

Young testified that VFM's core business is the distribution of non-metallic parts for the automotive industry. He stated the only manufacturing VFM does is for thermal molding,[2] which began in approximately 2011. Young said that PSC has not done this type of molding in many years, and he was told it was an area of business they were not interested in.

Young hired and trained a salesman, Jim Schlotterbeck ("Schlotterbeck"), for PSC who took over as salesman for PSC's TBA account after Young became sales manager. In August 2016, Woodbridge, a Toyota supplier located in Canada, sent a request to Schlotterbeck for some fabric they needed. Young told Schlotterbeck to inform Woodbridge that PSC did not do that type of work, but that VFM did. Schlotterbeck told the Woodbridge buyer to reach out to Young. This led to an eventual contract with VFM. While Young was no longer working for PSC by this time, Schlotterbeck still was. Schlotterbeck was familiar with Woodbridge because they purchased large amounts of die-cuts[3] from PSC.

In addition to training Schlotterbeck, Young also trained his management replacement at PSC, Parr. Parr previously worked in PSC's

[2] Thermal molding uses a machine to apply heat to a usually plastic material to cause it to accept the shape of a mold.

[3] A die-cut is a two-dimensional item produced by the use of sharpened blades pressed through a material such as plastic or metal.

engineering department. In mid-2016, Young asked Parr for some assistance with layout designs, known as CAD[4] drawings. Parr supplied this information to Young. Young asked Parr for assistance because he did not have the requisite CAD program, and he also lacked the engineering background Parr had. Young did not believe asking Parr for assistance was improper, as it did not involve any business in which PSC was involved.

In 2018, Parr sent text messages to Young saying he had been questioned about him and VFM. Young didn't think it was any of their business, as he had left PSC several years prior. Young stated that Parr told him, "I said I didn't know." Young didn't care what Parr had told them, as several of PSC's upper management were aware of VFM.

In 2019, Young sent PSC and Kamins a letter and a box of samples from VFM to show them that VFM was not a competitor of PSC. The letter directed them to VFM's website, which laid out the scope of the business. Young testified no one from PSC or PMC ever reached out to him in response.

Young conceded that he took VFM phone calls while he was travelling for PSC business or while working for PSC. He testified this did not take anything away from his normal job duties for PSC and was not any different than taking a personal phone call during work hours. He further explained that his

---

[4] Computer-aided design.

job as a salesman for PSC was not a normal 40-hour work week with a set schedule. He often worked evenings and weekends and other odd hours.

According to Young, in November 2011 he made a full disclosure of VFM and its activities to Osbourne, who was PSC's president at the time. Young insists he specifically told Osbourne about the flame lamination and the distribution business VFM was doing. He did not recall if the name of the company was disclosed.

Young further stated that at a management dinner in January 2015, Kamins acknowledged to Young that he was aware of his side business. Young recalled a heated conversation, because, while there were several management members who did not approve of Young's other business, Kamins did not state an objection.

Throughout his testimony, Young was adamant that VFM was not a competitor of PSC. He stated he never quoted a piece of business that PSC did. He testified that VFM's areas of business were areas that PSC did not do. Specifically, regarding flame lamination, Young testified that not only did PSC stop doing that business, but they also sold all their equipment that could do that line of work.

PSC's second witness was Thomas, who has been president of PSC since April 2018. He occasionally worked with Young during his last few years

with PSC. Thomas testified Young came back onto his radar in mid-2018 when a general manager informed him that Young may have a competing business. Thomas then looked up VFM's website, and was "shocked" by what it showed, as all the equipment shown in the video looked like PSC's equipment. He stated he had no idea Young was doing that type of work. Thomas informed the rest of the executive team, who were all also surprised.

Thomas explained that PSC does, in fact, do distribution business and sewing. He also stated that PSC "could have" made some of the parts shown on VFM's website; it would just take some modification to some of the machinery. But Thomas confirmed that PSC discontinued flame lamination in 2003.

Thomas stated PSC sent a cease-and-desist letter to Young in July 2018. He also testified he saw the box of samples Young had sent to PSC. He agreed that no one reached out to Young, as he saw no reason to do so.

Thomas stated that PSC's suppliers and materials are considered confidential information. He disagreed with Young that it is common practice to refer customers to other suppliers if PSC cannot provide a particular item. If PSC decides not to supply a part, he does not make a referral to anyone else.

Thomas recalled the January 2015 management dinner quite differently than portrayed by Young. According to Thomas, Young informed those at the dinner that he was retiring due to his health and to spend more time

with his family. He claims Young never mentioned anything about VFM or any distribution business.

Thomas told the salespeople at PSC that there is no line of business that PSC is not interested in. He claimed it was the job of sales employees to bring new business to them. On cross-examination by Young's counsel, Thomas acknowledged that PSC discontinued flame lamination, and he was unaware if PSC did any toll-cutting[5] for any automotive customers. He additionally conceded that PSC did not do any sewing for the automotive industry prior to its acquisition of Buckley in 2019. Buckley is a company that does textile cutting and sewing.

Thomas agreed that TBA was PSC's largest automotive customer. He was aware of the lawsuit PSC has now filed against TBA, in which they alleged TBA conspired with Young to harm PSC. Thomas said he was unaware if TBA will continue to do business with PSC. He was also uncertain if their sales requests from TBA have changed in any way since the litigation was filed.

PSC's next witness was Luke Stewart, who is PSC's general manager of the machinery technology division. He testified that the current presses PSC has are used for die-cutting, but they have the capability to be converted into molding presses. He said there has been no move to convert any of the presses, and to his

---

[5] A toll process indicates a situation where one company creates items for another company with material supplied by the customer. Later in this Opinion a witness will explain this process more fully.

knowledge, they have only been used for die-cutting. He agreed that PSC Fabrication, the division that did work for the automotive industry, did not have sewing machines prior to 2019.

Christopher Hart ("Hart"), PSC's Chief Financial Officer, was called as PSC's next witness. He reports directly to Thomas. He explained the profit margins on certain items, as well as the process for PSC to invest in new machinery. He stated that competition is a factor that influences profits. If there are several competitors for a product, they must quote a lower price to be competitive. If no one else is providing a product, they can quote a higher price and make more profit.

Hart explained that Young had nothing to do with PSC's recent decline in sales. Several of PSC's larger customers made changes to their accounts. For example, one customer was bought by a larger company in China, who already had suppliers, so they lost that account. Another customer began buying directly from the manufacturer.

He agreed with Thomas's testimony that Young informed them he was retiring because he wanted to spend more time with his family. He claims Young made no mention of another business. He further agreed that TBA was one of PSC's largest automotive customers.

PSC's Vice President of Human Resources, Flowers, testified next. She is the one who oversees employee policies. She said that all employees must sign an employment agreement, which includes a confidentiality agreement, as well as an acknowledgment that they have received and reviewed the employee handbook. A code of ethics is outlined in the handbook. The handbook specifically directs that employees are to avoid any conflicts of interest. As Flowers understood it, if Young or another employee was selling anything to a current PSC customer that was not a PSC product, it was a conflict of interest. It did not matter if Young and VFM were selling different products. Anything involving the same customers was an inherent conflict of interest.

Flowers testified that Young signed all the same documents that every other employee did. She claimed she had no knowledge of VFM until Thomas told her about it in 2018. Flowers recalled that when Young left PSC, he was one of the highest paid employees they had.

Flowers believed that while Young was a successful salesman for PSC, his actions with VFM violated his employment agreement. She insists he should have asked permission from the management at PSC to start VFM, even if his goal was to help an existing customer of PSC.

Following Flowers' testimony, PSC played the video deposition of Downes. She works in the purchasing department of TBA, where she has been

employed since 2009. Her primary contact with PSC was Young, until he was promoted. The PSC salesman handling TBA's account after Young was Schlotterbeck, who reported to Young.

Downes said that, after several years of her doing business with PSC, TBA needed a three-dimensional molded part. Schlotterbeck told her that PSC was unable to make this part. After having a conversation with Young, he informed her he could get that part for TBA. VFM did subsequently supply what TBA needed. Downes stated that, while she knew Young worked with both PSC and VFM, she didn't know at the time that Young was an owner of VFM.

Downes explained that die-cut parts were two-dimensional, and she got that type of parts solely from PSC. She recalled that VFM did not have the cutting capability to make the two-dimensional die-cut parts, whereas PSC did not have the machines to make the molded three-dimensional parts that TBA needed. So, as a purchaser for TBA, she made requests to both companies, through Young, depending on the type of part that was needed. Downes occasionally sent a request for quotes ("RFQ") to both companies if she was unsure which company could provide the part. She stated that despite this, she did not consider VFM and PSC to be competitors, because they supplied different types of parts.

Following Downes' deposition, PSC played a video deposition of Schlotterbeck. He is a sales representative of PSC and has held that position since

2010. Schlotterbeck traveled extensively with Young. When Young was promoted, Schlotterbeck became responsible for the TBA account, and it was his largest customer.

Schlotterbeck recounted a conversation between himself and Young, when he asked Young how he could own a company that also sold automotive parts while still working for PSC. Young replied that his company supplied products that PSC did not, but he also indicated that it was a "don't ask, don't tell" situation. Schlotterbeck followed that approach, as Young was his boss at the time. Schlotterbeck believed that some of the key management members were aware of VFM.

Schlotterbeck gave his understanding of VFM which was that it mostly did distribution. He approached PSC about distributing some goods that were requested by a customer, and he was told by a manager that PSC did not do distribution work. Schlotterbeck remembered there were sales calls where he, Young, and Downes were all on the line, and Downes would become confused as to which company she was dealing with. She would occasionally send Schlotterbeck emails that were meant for Young, so Schlotterbeck would forward them to Young. Schlotterbeck believes there were a few occasions where both PSC and VFM submitted quotes for the same part.

Schlotterbeck told of the business opportunity that arose with a Canadian company by the name of Woodbridge. Susan Kenney emailed Schlotterbeck to inquire about a particular part using molded felt. Schlotterbeck responded that PSC does not do molded parts, but he had a friend who owned a company that did. He passed Young's information on to her. This later led to a contract between VFM and Woodbridge.

Schlotterbeck further stated that this led to conversations between him and Young about the possibility of him "moonlighting" for VFM. No actual agreement was reached, and nothing was ever written down, but they discussed Schlotterbeck earning 2-3% commission on business Schlotterbeck brought to VFM. This was to occur while Schlotterbeck was still employed at PSC. Schlotterbeck was never paid anything by Young or VFM.

Schlotterbeck said the situation with Woodbridge was the only time this type of event occurred. There were no other customers in which he represented both VFM and PSC. He did not actually want to do much work for VFM, as he was busy enough with PSC business. He insists that he never attempted to get business for VFM from a company that was an existing customer of PSC. He further said he did not refer any business from PSC to VFM. Since he was paid a commission by PSC, it would have been directly against his own interests to do so.

Schlotterbeck considers VFM to be a competitor of PSC. He learned through this case that there are some processes and products provided by both companies. But he is not aware of any business that PSC lost to VFM.

Schlotterbeck has been told by management that PSC will do molding and distribution. To his knowledge, PSC has not done this before, other than the molded foam they quit doing before he began his employment with them. He was told that if VFM went under, PSC should be ready to take over its molding business. While he never heard anyone say that they wanted to put Young or VFM out of business, he believed such inferences were made. He does not believe PSC has purchased any equipment to do molding.

PSC's next witness was Kamins. Kamins is the CEO of PMC. He and his family own 95% of the company. PMC owns PSC, and approximately 75-80 other companies around the world. Kamins meets with the PSC management about seven to eight times a year at the Louisville headquarters. PMC will supply the capital PSC requires when it needs new equipment or to build a new factory. Kamins further testified he has total control over the company, and that is how he wants it. He stated the board of directors only exists for when he dies, but until that happens, he controls. He was the one who made the decision to file this lawsuit, and he was the one who decided to dismiss PSC's prior legal team after the preparation of the Parr Affidavit.

Kamins does not know Young well. He does know Osbourne well, and he felt that Osbourne was a very valuable employee of PSC. It was Osbourne who recommended Young be promoted to the position he held. Kamins stated he was very surprised when Young told them he was going to retire. He remembers being told that Young was dying of throat cancer and wanted to spend more time with his family. Kamins thought it must have been a very serious health situation to walk away from his salary and benefits that PSC was giving to him.

While Kamins admits he was aware that Young had a few small side businesses, he was unaware that he was selling products to one of PSC's customers. He believed the side businesses merely consisted of an inherited warehouse and a gas station. He became aware of VFM in 2018, when Thomas brought it to his attention.

Kamins became visibly angry during his testimony when discussing Young and VFM. PSC "wasted a lot of money on him while he established his own empire." He felt that Young cheated those employees who relied on him to bring business to PSC.

Kamins further believed that PSC could make "anything." PSC has a lot of competitors, and he is not worried about VFM being a competitor. He stated the issue was that Young was supposed to be spending his time working for PSC and PSC only. It did not matter if VFM was competing with PSC or not. When

you're an executive, "you should be working twenty-four hours a day, seven days a week." An executive of a company should be "totally devoted" to the company. When shown the box of samples Young sent to PSC, Kamins was unaware if they were parts PSC made or not. He stated: "I don't know what the hell they make."

He referred to Young as a "crook" and a "thief." The jury heard Kamins say: "we're paying for his devotion to our products and to our business, and if he has a rejection over here, he goes somewhere else . . . he doesn't spend his time picking up the scraps we don't want and building his own business while we're paying him." He went on to state that Young was not the person who gets to decide if PSC does a job or not. "Everything he finds should be brought to PSC, and if PSC doesn't want to do it, then they don't do it. He doesn't set up a machine to do it himself in his garage."

As far as Osbourne is concerned, Kamins had no complaints against him. Kamins testified he only added Osbourne to the lawsuit to get him into court to testify as to what he knew. Apparently, a subpoena would not suffice for this purpose.

PSC's next witness was Zeta Bouligaraki. She is a chemist with PMC. She was unaware of Young's side business. She remembered when Young announced he was retiring, and it was because of health reasons. She was surprised he would retire, because she could see him running the company one day,

as he was very successful. As she is not really involved with PSC, she was unable to testify as to the type of parts they did or did not make.

PSC's next witness was Gary Kamins, via video deposition. Gary Kamins is Kamins' son and the president of PMC. He is also an officer and on the board of directors for PSC. When PSC changed its management structure, they decided on a trilateral team structure. There were three individuals who would be equal and have different functions. Young would oversee sales, Bill Leurman ("Leurman") would control factories and operations, and Chris Hartman would lead the finance department. Young was considered a valuable member of PSC. His issue with VFM was the timing of it. He believes Young should not have been quoting work for VFM while he was still employed with PSC, regardless of whether the parts being sold by the companies were different.

PSC called Thian Choy Cheong ("Cheong") to testify. He has many roles with PMC Global, where he has been employed for 39 years. He is additionally the secretary, treasurer, and assistant CFO[6] of PSC. He was present at a meeting in January 2015 on Kamins' yacht in which the new management structure was discussed. It was at this meeting that Osbourne strongly recommended a management position for Young. He recalled Osbourne mentioning Young had a "warehouse business." He stated there was no discussion

---

[6] Chief Financial Officer.

about distribution or selling automotive parts. Neither the name, VFM, nor any customers were mentioned. Osbourne had retired as PSC's president at the time of this meeting. Cheong also recalls several other individuals, including Kamins, being involved in this conversation.

As assistant CFO of PSC, he receives their financial statements. He testified sales have been trending downward since about 2016. He also stated Young has never been mentioned in any of the financial statements. He understood Young to have been a successful salesman for PSC.

PSC then called Hawkins. Hawkins is 51% owner of VFM. She keeps the books for VFM. Prior to 2009, neither she nor Young made much money with VFM because VFM was not initially very profitable. Most of the profits were distributed as compensation. They did not have a set salary because sales and profits were unpredictable. Hawkins started working full-time for VFM in 2009. Some of the most profitable years for VFM were 2014-2017, because they did not have many employees. As the years went on, they were able to hire more employees and offer more employee benefits, so the profit margins of the company were lower. VFM currently has 12 employees.

The next witness, Parr, testified via video deposition. He began working at PSC in 2006, and he held many positions over the years. In approximately 2015 or 2016, he became global sales manager. His employment

with PSC ended in August 2019. When Parr started working in sales, he was trained by Young. Once he became global sales manager, he traveled extensively with Young, including internationally. He and Young became close.

In 2016, PSC's upper management, including Leurman, Thomas, and Hart, all began to question what Young was doing. They had heard he had another business. In 2017, there were discussions about PSC's sales declining. He began to hear rumblings that sales were down because Young was taking business away from PSC. In Parr's opinion there were a variety of reasons why sales were declining, including PSC's inefficiency in getting orders to customers.

In July 2017, Parr and others received a letter from Flowers, asking if anyone had any information regarding Young and his activities. The letter told them to hold on to that information and be prepared to present it. He was asked if he believed Young and VFM were competing with PSC. Parr stated he did not believe Young would do anything to intentionally harm PSC.

Parr was asked about the box of samples Young sent to PSC and about VFM's website. He was asked if those were things PSC could do. He responded that they had the capability to do them, but they do not actually make those parts.

In July 2019, Parr was asked to meet with the attorneys PSC had originally retained for this action. Flowers and Thomas were also present at these

meetings. He attended four to five meetings, all of which lasted multiple hours. The final meeting was when he was asked to sign the Parr Affidavit. Parr was presented with an affidavit and asked to sign. He requested to change some statements in the affidavit, as he did not believe everything was accurate. Some things were changed, and some were not. He was not allowed to take the "red-line" version of the affidavit with him, as the lawyers told him it belonged to them.

Prior to signing the Parr Affidavit, Parr said he was promised "asylum" and would be granted a "life raft" if he cooperated with them. He believed he would be fired and added to the lawsuit if he did not sign the affidavit. Thomas told him at one point that the FBI was investigating Young. He does not believe the affidavit was accurate in its final form.

There were several audio files played during Parr's deposition, which were recorded during the meetings with PSC's prior counsel. There is a reference to "immunity" made in one audio clip. Another clip mentions taking care of his family. Parr explained that he was unaware these meetings were recorded. No one informed him of this at the time or asked for his permission.

After he signed the Parr Affidavit, there was another meeting in the PMC conference room. Kamins was present at this meeting. Kamins told Parr that they needed to solve this case, and he knew Parr knew something because he traveled with Young so often. Kamins stated that if Parr really did not know

anything, then he was stupid, and if he was that stupid, maybe that is why their sales are down, because he was too stupid to grow a business. Parr testified that Kamins then threatened to come after him and his family. Parr was terminated by PSC in August 2019, less than three weeks after he signed the Parr Affidavit, despite the discussions of protection if he signed the affidavit.

Parr testified that both Osbourne and Mike Mattingly, also with PSC, knew about VFM. He believed the type of work VFM was doing was different than what PSC was doing, at least at that time. Parr said there was never any agreement between him and Young regarding any type of employment or arrangement with VFM. There was one instance where Parr received a finder's fee from someone and that was from Bill Yarbrough ("Yarbrough") through his company, not from Young or VFM.

In early 2016, Young requested Parr assist him with CAD drawings. Parr stated he had the AutoCAD program on his computer from his time as an engineer. He understood the information was for VFM, not PSC. He stated he did not question the reason at the time, because Young was his boss when this request was made. He was unable to discern from the drawings themselves whether the final part would be two-dimensional or three-dimensional. If it was two-dimensional, it would have been in competition with PSC. If it was three-dimensional, it would not have been a part PSC would make.

PSC's next witness was Leurman. He worked for PSC for approximately twenty years, with his highest rank being that of Chief Operating Officer ("COO"). He became COO when Osbourne retired. He and Osbourne did not really get along. According to Leurman, Osbourne never said anything about Young having another business. Leurman said he first learned about VFM in 2018, but he recalled rumors prior to 2018 about Young having a competing business.

Leurman did not really care for Young. He believed Young had an ego problem. It was his understanding that he and Hart would be the management team. He did not think Young was included in the management structure.

Osbourne was next to testify. He began working for PSC in 1971, and he was president from 2010-2013. Afterwards, he acted as a consultant and officially retired at the end of 2014.

In November 2011, Osbourne recalled he and Young having a conversation at a "deer camp." It was then that Young informed him of the distribution business he was doing with TBA. He additionally informed him of the flame lamination he was doing, as PSC had withdrawn from doing that business. He testified he was not concerned with what Young was doing. Young told him his business was not competing with PSC, and Osbourne believed him.

Osbourne testified he informed Buck Thacker ("Thacker") about Young's business. When he disclosed this to Thacker, he was president and Thacker was the CEO of PSC; there was no one higher than him to report to. He also stated that "everyone" knew about Young's warehouse business.

Osbourne was unaware at the time that Young had a molding press. Osbourne had testified in his prior deposition that, had he known this, he would have fired Young. In his trial testimony, Osbourne relented and said that it would have been a reason to fire Young, but he probably would not have because Young was too valuable to PSC.

Additionally, Osbourne stated the molding VFM was doing was not an area PSC would be interested in, because the molding takes too long to be profitable. Osbourne insisted that, despite the allegations in the complaint against him, he never received anything from VFM or Young.

PSC's final witness was its financial expert, John Bone ("Bone"). Bone is a forensic accountant and regularly testifies regarding financial damages. He offered his opinion on Young's unjust enrichment based on the claims of misappropriation of trade secrets and breach of fiduciary duty. He testified that for the sake of his analysis, he assumes the jury would find in favor of PSC and against Young, but he was clear that those assumptions were made solely for his

calculations. He gave no opinion on whether Young breached a duty or misappropriated anything.

He determined that if there was a breach of fiduciary duty on the part of Gary Young, then the unjust enrichment subject to disgorgement would be $4.8 million. If the jury were to find misappropriation of trade secrets, $1.6 million would be the appropriate award of damages. Bone explained that if the jury found Young liable for both claims, there would be some overlap in those numbers. It would not be appropriate to add the figures together, as that would lead to double damages. Bone calculated the total amount of damages if the jury found in favor of PSC on both claims to be $4.95 million.

Bone testified under cross-examination that the damages amount included income from VFM to Hawkins, who is not a party to the lawsuit. Some of the damages also necessitated a finding that Osbourne breached his fiduciary duty to PSC. He further stated if the jury only found Young liable on some of the trade secret appropriation or breach of fiduciary duty claims, the full amount of damages would not be accurate.

At the completion of Bone's testimony, all Defendants made the appropriate motions for direct verdict, which were denied. After a break, the parties returned informing the circuit court that they had reached an agreement as to Osbourne. Plaintiffs agreed to dismiss the case against him. After all, Kamins

had stated that the only reason he was sued was to find out what he knew. Apparently, his testimony satisfied Kamins.

Young then began calling his witnesses. His first witness was George Heuser ("Heuser"). He is a retired materials manager of PSC, where he worked for 46 years. Heuser testified PSC's fabricating department's primary business was die-cutting two-dimensional parts. PSC stopped doing flame laminate in the late 1990s. He stated that 90% of what PSC sold was fabricated in-house. The remaining 10% were distribution items that were distributed for certain customers. Heuser testified distribution items were usually for a customer that wanted to consolidate suppliers, so they were willing to pay more for the convenience. He further stated that PSC was less likely to do distribution with automotive goods than other goods, because in the automotive industry, much of what they sell is visible to the customer. It had to be clean and free of any defects. He explained that when the product is not yours, you have less control over the quality. They did not want to be in the middle if a customer had an issue with a part.

He talked about a certain part that had been discussed by several previous witnesses, in which both VFM and PSC gave quotes to TBA. PSC quoted the part with different material than requested; VFM was able to quote it with the requested material. Heuser testified PSC had been unable to find adequate quantities of the requested material domestically. He stated if PSC had been able

-30-

to get enough of the material, they could have quoted and completed the job as requested by TBA.

Heuser additionally explained the process of toll-cutting, and why PSC did not engage in this business. This method was used when a customer would send in their material. A company would die-cut it in the requested way, and then it would be sent back to the customer. He stated the company does not own the material and therefore cannot mark up the price of the material. This process means the company can only charge for the labor, which is not profitable enough for a large company such as PSC.

Heuser said PSC did not do sewing for automotive customers. He believed there was a division that did sewing for some HVAC[7] customers, but he is unsure if the same machines could be used for automotive sewing. When asked about molding, Heuser stated PSC could not be profitable doing molding, because the process takes so much longer. He stated molding presses make about one part per minute. PSC's die-cutting machines cut 400-1000 pieces per minute.

Young next called Pat Lyvers ("Lyvers") to testify. He previously worked at PSC from 2015-2016 as the lead estimator. His job was to review quotes and make sure they met the customer's standards. He testified that PSC did not give any quotes on molded parts while he was there. He further stated it was

---

[7] Heating, ventilation, and air conditioning.

"frowned upon" to do distribution work at PSC. He clarified that PSC wanted to have value added to a part, rather than simply have a part "pass through" PSC. Lyvers stated multiple people at PSC told him that PSC was moving away from distribution work and did not seek it out.

Lyvers left PSC to work at VFM. Young told him VFM did not directly compete with PSC, as he did not want to work with them if they were a competitor. After working for both companies, he does not believe that VFM is in competition with PSC. VFM did not have a die-cutting press when he started at VFM, which was in August 2016. VFM did later acquire one. Lyvers is no longer employed with VFM.

Young's next witness was David Johnson ("Johnson"). He worked in sales at PSC for 45 years. When he began in 1973, PSC was a small company. He was terminated at the end of 2017. Johnson believes Nissan was PSC's first automotive customer, which is business he obtained for PSC.

Johnson knows Young and has known him since Young started at PSC. Johnson believes Young was a very effective salesman for PSC. He thinks Young brought in Toyota as a customer. On several occasions, Johnson took business opportunities to PSC, and PSC turned them down. Johnson stated that when PSC stopped doing the flame lamination, it drastically impacted one of his clients. This resulted in PSC losing that customer.

Johnson recalled PSC doing distribution work for two customers. One of these customers was Nissan, and PSC did distribution work for them as a favor, because they did millions of dollars of business with PSC. PSC did distribution work for only a short period of time for the second customer, but it stopped doing so. PSC ended up losing this business, and Johnson believes this is the reason. He further stated there was never any discussion of PSC expanding its distribution business. Johnson said there was no sewing business while he was there.

Joseph Evans ("Evans") testified next. He is the general manager of Seal Methods ("SMI"), which is a converter fabricator company in California. He knows Young because they were on an advisory board together. SMI and PSC are competitors. Even so, they attempted to partner together for a joint venture in China, which was ultimately unsuccessful.

Evans became aware of VFM after Young left PSC when Young reached out to him to buy some tape from SMI. SMI still supplies this tape to VFM, but that is the only product. Evans has been to both PSC and VFM's facilities. He does not consider them to be competitors, as they supply different products.

In addition to the tape VFM purchases from SMI, SMI was an initial investor in VFM's Mexico facility and owns an interest in it. He stated if VFM

were to go out of business, SMI would lose its initial investment, but it would not impact their business. PSC and SMI have never been customers of one another.

Young's next witness was Yarbrough, who testified via video deposition. Yarbrough is the founder of Yarbrough Technical Associates, Inc. ("YTA"). YTA is a manufacturers' representatives' organization. Essentially, YTA connects suppliers and customers. YTA did some business for PSC. He met Young through his work with PSC, although he did not work directly with Young.

YTA has also worked with VFM, although not until after Young retired from PSC. Yarbrough has seen both PSC and VFM factories, although he conceded he only saw PSC's Louisville facilities. As part of his work with YTA, Yarbrough likes to be very familiar with what the core competencies are of the businesses he represents. He did not believe VFM and PSC were direct competitors.

Yarbrough worked with Parr on several occasions while Parr was with PSC. He recalled one instance where he sent information to both PSC and VFM regarding a lead, although he does not believe either company submitted a quote. Parr received a finder's fee from YTA on one instance where Parr assisted Yarbrough in finding a supplier for a part for GE when PSC was unable to meet the specifications of GE. This led to a contract between GE and the other supplier,

which was not VFM. There was never any other agreement or payment between Parr and YTA.

Young then testified again on his own behalf. Young stated he attempted to pursue new lines of business for PSC while he was employed with them. He encouraged PSC to do molding on several occasions, and he was told that PSC was not going to do it.

Young had developed many business relationships over the years, but he has never used those relationships to gain business for VFM. Other than TBA, there is only one customer of PSC that VFM does business with, and that company reached out to him several years ago.

Young stated the lawsuit has been incredibly stressful for him and Hawkins. Instead of focusing on their business, they are focused on the lawsuit. He testified that their legal fees are taking much of VFM's profits, so he and Hawkins are not getting paid much so they can continue to pay their employees. He stated VFM has paid $798,000 in legal fees prior to the start of the trial.

PSC then recalled Flowers in rebuttal. She testified mostly regarding the Parr Affidavit. She stated it was PSC's prior counsel who drafted the affidavit. She was present for the interviews with the employees. Many employees were interviewed, not just Parr. Parr did have more and longer interviews because he was not forthcoming at first, and he had traveled and been involved frequently with

Young. She reviewed the Parr Affidavit after he signed it, and she believes it accurately reflects what he stated in his interviews. She had no reason to believe anything in the affidavit was false. She agreed that Parr asked for changes to the affidavit, and she believed those edits were made.

On the last day of the trial, Young called Rich Norris ("Norris") as his final witness. He is the Vice President of Purchasing at TBA, where he has been employed for 14 years. He was promoted to his current position three years ago. PSC is TBA's largest supplier of die-cuts. He does not recall an instance where PSC has provided roll goods to TBA. VFM also supplies parts to TBA, mostly roll goods and molded items. He testified that VFM has supplied TBA with some die-cuts, mostly floor insulators. PSC has also supplied floor insulators to TBA. He believes the floor insulators VFM supplies were distributor items, while PSC die-cuts their own.

Norris is very familiar with Downes. He testified she was incredibly loyal to PSC. She sent PSC all their die-cut business, even though she was encouraged to send RFQs to other companies as well, as they like to have competition between companies.

After this litigation commenced, there was a meeting between himself and Thomas. There was a discussion about a potential lawsuit between the

companies.  Norris testified that Thomas requested that Downes be fired.  Norris said that, while it was considered, TBA ultimately decided not to fire Downes.

PSC has filed an arbitration suit against TBA.  They have alleged TBA assisted Young in breaching his fiduciary duties to PSC through the actions of Downes.  Norris testified the current relationship between the companies is "not great."  In addition to PSC suing them, Norris stated PSC has unilaterally raised prices in a way that is not consistent with their contract.  He also stated their delivery and quality has had some issues recently.  He then testified TBA has a good relationship with VFM.

PSC then called Thomas in rebuttal.  He acknowledged the meeting between him and Norris, but he denies requesting that Downes be fired.  It was his understanding from the meeting that TBA intended to fire her.  He stated his intention for the meeting was to make sure they were all operating on a "level playing field."  Thomas also wanted to be sure TBA was aware of everything PSC could do for them, as he believed Young had told several customers that PSC did not provide goods or services that they do.

At the conclusion of all the evidence, the counterclaim defendants made a proper motion for a directed verdict, which the circuit court denied.  The jury deliberated for approximately seven hours before returning with a verdict.  As to the direct claims PSC pursued against Young and VFM, the jury ruled in favor

of Young as to all claims of misappropriation of a trade secret. It likewise found in Young's favor regarding the breach of employment agreement claim. The jury ruled, however, that Young did engage in conduct that breached his fiduciary duty of loyalty to PSC. They found VFM did not aid and abet Young's breach of duty, and therefore apportioned 100% of the awarded damages for the breach of duty claim to Young. The jury awarded damages in the amount of $100,713.50 to PSC. It found in favor of Young and VFM on the unjust enrichment claims. The jury did find that VFMI had been unjustly enriched at PSC's expense because of the expenses PSC paid for Young for a trip used at least partially for other business opportunities. The jury awarded PSC damages for this claim in the amount of $3,400.00. The jury also found that Young engaged in fraudulent concealment, but they found no damages on this claim.

Regarding the factual statute of limitations questions, the jury determined that Young made a full disclosure to Osbourne in 2011. It also found that no damages they awarded to PSC on its above claims were based on actions taken after August 3, 2013. The jury also determined that PSC had not established that Young or VFM acted in reckless disregard for the rights or property of PSC, and therefore it awarded no punitive damages.

As to the counterclaims, the jury found that all counterclaim defendants engaged in an abuse of process regarding the Parr Affidavit. It

apportioned 70% of the fault to Kamins, and 7.5% to each of the remaining counterclaim defendants. They further found that PSC, PMC, and Phil Kamins engaged in abuse of process with respect to the initiation of the litigation. The jury apportioned 80% of fault to Kamins, and 10% each to PSC and PMC. The jury awarded Young and VFM $498,780.00 in damages. The jury determined that PSC, PMC, and Phil Kamins acted with fraud, oppression, or malice, and therefore awarded Young and VFM punitive damages in the amount of $653,636.38.

The circuit court entered judgment in accordance with the jury's verdict. Based on the jury's finding that Young made a full disclosure in 2011, the statute of limitations barred recovery of damages other than the $3,400 damages awarded on the travel expenses related claim. As a result, the circuit court judgment was entered in Young's favor on the breach of fiduciary duty claim. This appeal and cross-appeal follow.

## ANALYSIS

## 2022-CA-1166-MR

Appellants contend the circuit court made multiple errors that entitle them to relief. First, they claim the abuse of process judgment must be vacated as a matter of law. They also argue the court erred in its conclusion that PSC's claim for breach of fiduciary duty was time-barred based on the finding of the jury. Finally, they claim the damages the jury awarded to PSC are inadequate and were a

-39-

product of prejudice against PSC. We will analyze these purported errors one at a time.

## I.      Abuse of Process Claim

Appellants' first claim of error is that the abuse of process of claim must be vacated because Appellants' actions cannot constitute abuse of process. Appellees claim two actions of Appellants met the criteria for abuse of process, the filing of the litigation and the filing of a false affidavit. Appellees claim Appellants filed the suit for the improper purpose of destroying and bankrupting both Young and VFM. They claim Appellants engaged in coercion and bribery to solicit the perjured Parr Affidavit to influence testimony and not only gain an advantage in the lawsuit but also as part of a process to destroy Young and VFM – not just achieving appropriate compensation in the suit. The jury found in favor of Appellees on both claims of abuse of process. We will analyze each allegedly abusive action individually.

The Appellants made the same arguments in their motion for summary judgment, their motion for directed verdict, and their motion for judgment notwithstanding the verdict ("JNOV"). "In reviewing a trial court's denial of a motion for directed verdict, all '*evidence which favors the prevailing party must be taken as true and the reviewing court is not at liberty to determine credibility or the weight which should be given to the evidence.*'" *McDonald's*

*Corp. v. Ogborn*, 309 S.W.3d 274, 294 (Ky. App. 2009) (emphasis in original) (citing *Humana of Kentucky, Inc., v. McKee*, 834 S.W.2d 711, 718 (Ky. App. 1992)). To justify presenting a claim to the jury, the circuit court must conclude, as a matter of law, that the evidence was sufficient to support the elements of the claim. *Id.* at 293.

"The essential elements of an action for abuse of process are (1) an ulterior purpose and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding. Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process is required and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion even though with bad intentions." *Simpson v. Laytart*, 962 S.W.2d 392, 394-95 (Ky. 1998) (citations omitted). *See also Sprint Communication Co., LP v. Leggett*, 307 S.W.3d 109 (Ky. 2010) (summarizing the history of the abuse of process tort in Kentucky).

We agree with Appellants that the filing of a lawsuit on its own is not enough to sustain a claim for abuse of process. Even assuming their motive was to bankrupt and "destroy" Young and VFM, this fails to satisfy the second prong of the claim. Young and VFM could not establish that PSC's initial filing of the lawsuit was a willful act not proper in the regular course of such a proceeding. We

must remember that PSC had legitimate claims to be litigated against Young and VFM.

"Kentucky courts have declined to find that a plaintiff has stated a claim for abuse of process where the defendant has done nothing more than file a lawsuit that lacked any legal basis for the purpose of retaliation." *Kinslow v. Fifth Third Bank, Inc.*, 529 F. App'x 467, 473 (6th Cir. 2013). The abuse of process claim was submitted to the jury with specific reference to the filing of the Complaint. This error requires us to vacate the judgment of abuse of process based on the filing of the suit by PSC. Because we find that action alone cannot meet the requirements of an abuse of process claim, we need not evaluate the statute of limitations question regarding the filing of the lawsuit.

By contrast, when we examine the Appellants' actions regarding the Parr Affidavit, a different picture emerges. Here, there is an action involving the process of a suit which could be found to be wrongful, and in this case, the jury did just that.

> [T]he gist of [abuse of process] is not commencing an action or causing process to issue without justification, but misusing or misapplying process justified in itself for an end other than that which it was designed to accomplish. The purpose for which the process is used, once it is issued, is the only thing of importance . . . . The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a

-42-

> threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort.

*Flynn v. Songer*, 399 S.W.2d 491, 494 (Ky. App. 1966) (quoting *Prosser on Torts* (3d ed.) § 115, pp. 876-77). The jury in this instance found all counterclaim defendants liable for abuse of process regarding the Parr Affidavit. We agree with the circuit court that there was enough of a factual issue to allow that claim to go to the jury.

The jury heard Parr's testimony of the hours-long interrogations he was subjected to by PSC's previous lawyers along with Thomas and Flowers. Parr spoke of the disturbing conversations taking place at the lawyers' offices, including promises of "immunity," "asylum," and a "life raft." Parr testified the final affidavit did not have all his requested changes and that it was not "accurate."

Parr felt that if he did not sign the affidavit, he would be terminated and sued. He was fired anyway. Parr said Kamins all but confirmed this after the signing of the affidavit, when he told him he would come after him and his family if he did not help them with the case. An audio clip from one of these interviews was played for the jury, in which Thomas is heard saying "Mr. Kamins wants anyone associated with this to be hung from the highest tree." This testimony, coupled with the testimony of Phil Kamins himself, was sufficient evidence of a willful and wrongful act in the process of the suit.

At this juncture we reject the complaint about evidence of other litigation tactics. Such evidence was inextricably intertwined with the course of this suit and showed a contemporaneous and improper intent and motive for the use of the Parr Affidavit.

This affidavit was presented to the circuit court to support Appellants' amended complaint to add more counts against Young. But it was also to be used as evidence as to why the court should grant a motion for an injunction to prevent Young from having any contact with employees of PSC and to stop competing with PSC. The injunction request could have been seen by the jury as part of an effort to shut down Young and VFM before any liability could be established through this protracted litigation, an effort largely unsuccessful when the jury's ultimate verdict against Young and VFM is examined.

The record includes evidence that this use of the process in the suit was part of an ulterior purpose far beyond simply seeking an amended complaint and a proper temporary injunction. It was a step toward the expressed intention of destroying Young and VFM regardless of establishing legal liability. Young and VFM presented sufficient evidence to support the jury's finding. "[T]his Court will not usurp the prerogative of the jury to believe a witness or set of witnesses, as opposed to another set of witnesses, and will not disturb the jury's verdict." *Rojo, Inc. v. Drifmeyer*, 357 S.W.2d 33, 35 (Ky. 1962).

-44-

Appellants' next argument is that the abuse of process counterclaim is barred by the *Noerr-Pennington* Doctrine. The Kentucky Supreme Court explained this doctrine in *Seiller Waterman, LLC v. Bardstown Capital Corporation*, 643 S.W.3d 68 (Ky. 2022). The doctrine arises from two cases in which the United States Supreme Court held "there could be no violation of the Sherman Act based on attempts to influence the passage or enforcement of certain laws." *Id.* at 75. Thus, there could be no liability under antitrust laws "for actions taken when petitioning authorities to take official action, regardless of the motives of the petitioners, even where the petitioning activity has the intent or effect of depriving another of property interests." *Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298 (6th Cir. 1992). As outlined in *Seiller*, Kentucky courts have also applied the doctrine to zoning cases. *See Grand Communities, Ltd. v. Stepner*, 170 S.W.3d 411 (Ky. App. 2004). Whether this doctrine applies is a matter of law, and we review "the application of the law to the facts and the appropriate legal standard *de novo*." *Kimbler v. Arms*, 102 S.W.3d 517, 522 (Ky. App. 2003).

All Kentucky cases citing the *Noerr-Pennington* doctrine had government agency involvement in some way. Other jurisdictions have applied the doctrine to private litigation, and "although originally developed in the antitrust context, the doctrine has now universally been applied to business torts." *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 310 (4th Cir. 2003). Despite

this application, it would be illogical to claim that the doctrine applies to every aspect of an abuse of process claim, as that would eviscerate the claim.

As we have already determined, the filing of the lawsuit in this instance cannot be enough to sustain a claim for abuse of process, so we need not analyze whether the *Noerr-Pennington* doctrine applies to that portion. We must analyze only the doctrine's application to the preparation and filing of the Parr Affidavit seeking injunctive relief. We do not believe this type of action is the sort of activity the doctrine was meant to protect.

While filing petitions in court to protect business interests is a constitutionally protected activity, we do not believe the act of coercing a false affidavit from a witness is or should be protected in purely private litigation between companies. The Appellants have pointed to no precedent where this type of behavior was protected outside the realm of antitrust suits, the area of law originally covered by the *Noerr-Pennington* doctrine. We decline to extend the doctrine to immunize this behavior in Kentucky.

Appellants further claim the circuit court erred in its jury instructions. They argue the instructions given were inadequate because they did not define the terms "ulterior and improper purpose" and "use of the process not proper in the regular conduct of the proceedings." They believe these terms are confusing and not readily understood by lay jurors, and they therefore should have been defined

-46-

further.  "Alleged errors regarding jury instructions are considered questions of law that we examine under a *de novo* standard of review."  *Hamilton v. CSX Transp., Inc.*, 208 S.W.3d 272, 275 (Ky. App. 2006).

Kentucky has long followed the "bare bones" approach to jury instructions.  "Our approach to instructions is that they should provide only the bare bones, which can be fleshed out by counsel in their closing arguments if they so desire."  *Cox v. Cooper*, 510 S.W.2d 530, 535 (Ky. 1974).  The terms at issue here are not so confusing that a lay juror would have difficulty understanding them.  Appellants had the opportunity during closing arguments to add detail to these instructions regarding the terms, and in fact, did just that.  Defining terms which can and should be reasonably understood by jurors would have been error.  *See McKinney v. Heisel*, 947 S.W.2d 32 (Ky. 1997).  We do not believe the circuit court erred in its instructions to the jury.

Appellants' final contention of error is that the counterclaim award is not supported by the evidence.  Their argument is two-fold; first, they argue no reasonable juror could conclude there was knowledge that the Parr Affidavit was false, and second, they claim there was insufficient evidence to support the amount of damages awarded.

The first issue is a factual finding by the jury.  "The standard for reversing jury verdicts is admittedly high," and one should not be disturbed if

supported by substantial evidence. *Shreve v. Biggerstaff*, 777 S.W.2d 616, 618 (Ky. App. 1989). "Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion and evidence that, when taken alone or in the light of all the evidence, has sufficient probative value to induce conviction in the minds of reasonable men." *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003).

We believe there was substantial evidence for the jury to find that the Appellants knew portions of the Parr Affidavit were false. While Flowers testified that she believed Parr's affidavit accurately reflected what he said in his lengthy interrogation, Parr testified otherwise. Parr stated both Flowers and Thomas were in those long meetings where he went back and forth with PSC's prior counsel about the statements within the affidavit. Parr testified both were present when he was presented with and told to sign the affidavit.

Parr also testified that when he created his Statement of Facts prior to signing the affidavit, he gave it to Thomas. When he attempted to make changes to the affidavit, it was Thomas who told Parr that he was "just playing with the words." Additionally, Norris testified that Thomas told him "in a roundabout way" that they wanted to put VFM out of business, which would not be just to seek appropriate damages in the lawsuit.

While Parr testified that Kamins did not make the threat to him until after he had signed the affidavit, it is still a reasonable conclusion that Kamins was aware of what was occurring before and during this time. Thomas told Parr that "Mr. Kamins wants anyone associated with this to be hung from the highest tree." In Kamins' own testimony, he stated he was the one who had complete control over everything. He made the decision to file the lawsuit and the decision to hire new legal counsel.

Again, while the testimony was conflicting, it is within the province of the jury to decide who to believe and disbelieve. "As a court of judicial review, this Court cannot substitute its judgment for that of a jury." *Humana, Inc. v. Fairchild*, 603 S.W.2d 918, 922 (Ky. App. 1980).

The second issue is the award of damages. Appellants claim there was insufficient evidence to justify the award of damages. While the jury instructions differentiated between the two activities that were claimed to constitute abuse of process, it did not separate the damages. Because we have vacated the judgment of abuse of process regarding the filing of the lawsuit as a separate claim, we must vacate and remand the award of damages for the abuse of process claim, because it cannot be determined what damages are applicable to the abuse of process related to the Parr Affidavit. Upon remand, damages must be determined anew.

## II.  Statute of Limitations Bar on Breach of Fiduciary Duty Claim

Appellants argue the circuit court's ruling that the breach of fiduciary duty claim was time-barred was in error.  First, they claim the jury's finding that Young made a full disclosure to Osbourne was not supported by the evidence.  Again, all the evidence in this action was testimonial and contradictory.  "[W]here there is a direct conflict in the evidence, then the weight of the evidence and the credibility of the witnesses are functions peculiarly within the province of the jury, and the jury's determination will not be disturbed." *Jones v. Commonwealth*, 281 S.W.2d 920, 922 (Ky. 1955).

Appellants claim that because the jury found that Young had breached his fiduciary duty to PSC, their finding that he had made a full disclosure in 2011 was contradictory.  This is not necessarily so.  The jury instructions regarding breach of fiduciary duty contained a list of actions that could have constituted a breach, and the jury only had to find that Young had engaged in one of those actions to have breached his duty.  The instructions did not require the jury to say which activity they believed Young had engaged in to breach his duty to PSC.

The Appellants' argument assumes that the jury found Young and VFM had competed with PSC, but we do not know if that was, in fact, the jury's finding.  The Appellants continue to state Young directly competed with PSC and that this was the reason for the lawsuit, but Kamins' testimony indicated that he did

-50-

not care if Young was competing with PSC. His testimony also made it clear that he didn't know what type of parts PSC produced. We decline to disturb the jury's finding that Young made a full disclosure in 2011.

Appellants' next argument is that the circuit court erred in treating the jury's finding of full disclosure as fatal to their breach of fiduciary duty claim. The ultimate issue of whether an action was timely filed is a question of law for the court. *Zapp v. CSX Transp., Inc.*, 300 S.W.3d 219, 221 (Ky. App. 2009). Questions of law are reviewed de novo. *Ford Motor Co. v. Jobe*, 544 S.W.3d 628, 631 (Ky. 2018).

The statute of limitations for a breach of fiduciary duty claim is five years. *Middleton v. Sampey*, 522 S.W.3d 875, 878 (Ky. App. 2017). KRS[8] 413.120(6). PSC filed its lawsuit on August 3, 2018, so any claims regarding a breach of fiduciary duty would have had to occur after August 3, 2013, to award PSC damages. PSC makes two arguments. First, they argue the tolling statute applies because the jury determined Young engaged in fraudulent concealment. Second, they argue the jury could have made the finding that some of Young's wrongful activities occurred after the August 2013 statute of limitations deadline. Neither argument has merit.

---

[8] Kentucky Revised Statutes.

PSC references Kentucky's tolling statute to support their claim that Young's breach was not time-barred. KRS 413.190(2) states:

> When a cause of action mentioned in KRS 413.090 to 413.160 accrues against a resident of this state, and he by absconding or concealing himself or by any other indirect means obstructs the prosecution of the action, the time of the continuance of the absence from the state or obstruction shall not be computed as any part of the period within which the action shall be commenced. But this saving shall not prevent the limitation from operating in favor of any other person not so acting, whether he is a necessary party to the action or not.

PSC argues that because Young had an affirmative duty to disclose his actions as a fiduciary of PSC, the statute of limitations is tolled, and therefore PSC is entitled to the damages the jury awarded them. But the jury instructions specifically dealt with this issue. While the jury did find that Young engaged in fraudulent concealment, they also found that he made a full disclosure about VFM to Osbourne in 2011. The jury instructions did not require the jury to specify when they believed the fraudulent concealment occurred. It naturally follows then, that the jury found an act of fraudulent concealment on Young's part occurred prior to 2011 or about something other than the existence of VFM, which was disclosed.

PSC laid out three specific actions on which the jury could base damages which occurred after August 2013. These were reflected in their proposed jury instructions and in the court's final instructions which were

presented to the jury.  In the statute of limitations instruction, one of the questions

read:

> If you found that PSC proved its claim for breach of
> fiduciary duty against Young and/or aiding and abetting
> fiduciary duty against VFM under Instructions 7 or 8,
> how much, if any, of the damages you awarded PSC for
> those claims was based on the Woodbridge opportunity,
> the HTNA die cut parts information, and/or travel
> expenses incurred by Young after August 3, 2013?

The jury answered "$0" in response to this instruction.  Again, it

follows that the damages they awarded to PSC for breach of fiduciary duty were

for actions that occurred prior to August 2013 and are therefore time-barred.  PSC

proposed the instructions that included these specific areas of possible recovery.

Counsel for the parties and the circuit court held a lengthy discussion about these

instructions.  If they wanted to include other possibilities, the time to do so was

during the conversation on the jury instructions.  Failure to raise an objection to the

circuit court regarding jury instructions waived any error.  CR[9] 51(3); *Gibson v.*

*Fuel Transport, Inc.*, 410 S.W.3d 56, 61-62 (Ky. 2013).

## III.    PSC's Awarded Damages

PSC's final contention of error is that the damages awarded by the

jury are inadequate and appear to have been the product of passion or prejudice

against them and in disregard of the evidence and/or the jury instructions.  They

---

[9] Kentucky Rules of Civil Procedure.

claim the circuit court erred in failing to grant them a new trial based on the

inadequate damages award. A jury verdict "will not be disturbed for inadequacy of

damages unless it is so small and disproportionate as to strike the mind at first

blush as being the result of passion, prejudice or mistake." *Simms v. Scott*, 346

S.W.2d 18, 20 (Ky. 1961).

> Whether to grant or deny a new trial for an allegedly
> excessive verdict lies within the discretion of the trial
> court. However, the amount of damages is a dispute left
> to the sound discretion of the jury, and its determination
> should not be set aside merely because the court would
> have reached a different conclusion. Instead, their
> decision should be disturbed only in the most egregious
> circumstances. Courts must refrain from disturbing the
> jury's assessment of damages if the verdict bears any
> relationship to the evidence of loss suffered. And once
> the issue [of excessive damages] is squarely presented to
> the trial judge, who heard and considered the evidence, a
> reviewing court on appeal cannot substitute its judgment
> on excessiveness for [the trial judge's] unless clearly
> erroneous.

*Asbury Univ. v. Powell*, 486 S.W.3d 246, 264 (Ky. 2016) (internal quotation marks

and citations omitted).

With these standards in mind, we decline to overturn the jury's

verdict. While PSC asked for damages in the millions, the jury awarded them just

over $100,000. PSC claims the only explanation for this award is that the jury

must have disregarded the evidence and the jury instructions. Having reviewed the

entirety of the evidence, PSC's victory is not the foregone conclusion it seems to believe it is.

PSC strenuously argues that disgorgement of profits is the proper remedy here. While we do not disagree, PSC still had to prove that a breach of fiduciary duty occurred, and that said breach caused the injury in order to award those damages. *Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 436 S.W.3d 189, 193 (Ky. 2013), *as modified* (Feb. 20, 2014). Even PSC's financial expert testified that if the jury did not find Young liable on all claims, the full amount of damages he testified to would not be accurate.

Again, this was an eight-day trial, with many witnesses who gave conflicting testimony. A common thread among many of the witnesses was that the parts VFM was making and/or distributing were not the same type of parts that PSC manufactured. Added to this fact, the CEO of PMC himself stated on the witness stand about PSC, "I don't know what the hell they make." He also stated, regarding Young, "he doesn't spend his time picking up the scraps we don't want and building his own business while we're paying him." It was a perfectly reasonable conclusion for the jury to decide that, for the most part, Young and VFM were not competing with PSC. The jury only found for PSC on a few of the claims it brought against Young and VFM.

PSC additionally argues it was prejudiced by the circuit court's allowance of evidence of other lawsuits and general "litigiousness," as well as the counterclaim evidence regarding the abuse of process claim. As stated previously, this evidence was inextricably intertwined with the other evidence presented. The circuit court believed the lawsuit filed by PSC against TBA was relevant for purposes other than showing PSC's litigiousness, and we agree. There were other lawsuits filed by PSC that the circuit court did not allow the jury to hear about. We believe the circuit court properly balanced the evidence to avoid undue prejudice to PSC.

Because we are affirming the allowance of the abuse of process claim as to the Parr Affidavit, PSC's arguments that this evidence being allowed to be presented to the jury was error have no merit. PSC itself states that Parr would have been called as a witness because of his involvement with Young, so the jury would have heard his testimony regardless.

We do not believe the circuit court's decision concerning the damages award is clearly erroneous or an abuse of discretion.

**2021-CA-0431-MR**

Appellees/Cross-Appellants argue the circuit court erred in dismissing three counts of their counterclaim prior to the trial. The counterclaim contained two counts of Soliciting Perjury and False Swearing, the first against PSC,

-56-

Thomas, and Flowers, and the second against PMC and Kamins. It also included the claim of Bribing a Witness, which was filed against PSC, Thomas, and Flowers. The circuit court determined that the judicial statements privilege applied, and so it dismissed these claims.

Appellees' first argument is that the judicial statements privilege does not apply under these facts. The existence of a privilege is a question of law and is subject to *de novo* review. *New Albany Main St. Properties, LLC v. Stratton*, 677 S.W.3d 345, 348 (Ky. 2023).

"A communication must fulfill two requirements in order to fall within the ambit of the judicial statements privilege. First, the communication must have been made 'preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as part of a judicial proceeding.'" *Id.* at 349 (quoting *General Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1127 (6th Cir. 1990) (citing RESTATEMENT (SECOND) OF TORTS § 587 (1977))). "Second, the communication must be material, pertinent, and relevant to the judicial proceeding." *Id.* Kentucky law is clear that "[t]he privilege is limited to communications and does not cover conduct." *Id. See also Halle v. Banner Indus. of N.E., Inc.*, 453 S.W.3d 179, 185 (Ky. App. 2014). We must recall that an abuse of process claim properly went forward because of the *conduct* relating to the Parr Affidavit.

The facts of this case run along a very fine line. Appellants/Cross-Appellees contend their *statements* that led to the Parr Affidavit are privileged as they were made during a judicial proceeding and material and relevant to that proceeding. Cross-Appellants allege it was Appellants' *conduct* that is the basis of their counterclaims.

"While the privilege does not outright bar an action, it renders it unsustainable if based exclusively on statements privileged under the law. The judicial statements privilege applies with equal force to statements in pleadings filed in judicial proceedings." *Deal v. First & Farmers Nat'l Bank, Inc.*, 518 S.W.3d 159, 173 (Ky. App. 2017).

The judicial statements privilege traditionally applied to cases of slander and perjury. There are few Kentucky cases that analyze the privilege outside of these contexts. There are even fewer cases that analyze the privilege when the person other than the one making the false statement is being sued.

The alleged false statements in this case come from the Parr Affidavit. Yet, no one is pursuing a claim against Parr. No one has argued that his statements would not be covered by the privilege. It is the actions of the people coercing Parr to sign the affidavit and the subsequent misuse of that affidavit that are at issue.

The circuit court relied on this Court's unpublished opinion in *Whitton v. Weis*, No. 2008-CA-001278-MR, 2009 WL 4882840 (Ky. App. 2009),[10] in making its ruling regarding the claims of soliciting perjury and false swearing. Although unpublished and therefore nonbinding, we choose to comment on the case, which the parties also spent a great deal of time analyzing. Some facts of that case are very similar.

In both actions, a witness not a party to the case admitted to lying under oath to keep their job. Both witnesses either believed or were told that they would be terminated if they did not do what was asked of them. This Court had also previously stated, "[i]t is the general rule that a civil action for damages will not lie for perjury made during litigation either by a party or a witness." *Lawson v. Hensley*, 712 S.W.2d 369, 370 (Ky. App. 1986).

This rule governs only civil liability and does not prevent criminal liability for such acts. This Court further explained in *Whitton* that the privilege applied despite KRS 446.070, a statute which recognizes civil liability for violation of standards established in statutes, including statutes establishing crimes. This reasoning is further outlined in *General Electric Company*, *supra*, as well as another case cited in *Whitton*: *Heavrin v. Nelson*, 384 F.3d 199 (6th Cir. 2004)

---

[10] We cite this unpublished opinion for reference as persuasive, nonbinding authority. Kentucky Rules of Appellate Procedures ("RAP") 41.

(applying Kentucky law). We therefore affirm the circuit court's conclusion that the counterclaims of soliciting perjury and false swearing should be dismissed.

The circuit court relied on *Halle, supra*, in dismissing the counterclaim of bribery.  The circuit court stated:

> [t]he Court finds the claim of bribery in this case is akin to a claim of fraud in the inducement which the court in *Halle* found the judicial statements privilege applied to. However, unlike *Halle*, the actions by PSC, Thomas, and Flowers towards Parr were clearly done in the course of litigation as the affidavit signed by Parr was sworn on July 22, 2019, and the lawsuit was filed in August 3, 2018. Thus, the Court finds that the judicial statements privilege also applies to Count II of the Counterclaim and it is dismissed.[11]

Cross-Appellants argue that the circuit court erred because the actions Appellants took were *conduct*, not *statements* which are protected.  As indicated previously, this distinction is a close one.  Other jurisdictions have concluded "[t]he distinction between communicative and noncommunicative conduct hinges on the gravamen of the action.  That is, the key in determining whether the privilege applies is whether the injury allegedly resulted from an act that was communicative in its essential nature." *Rusheen v. Cohen*, 128 P.3d 713, 719 (Ca. 2006).  The court noted several examples of acts deemed communicative and thus protected by the privilege as well as noncommunicative actions which are

---

[11] Order Granting Summary Judgment in Part and Denying in Part, entered March 19, 2021.

-60-

unprivileged. The court differentiated between the testimonial use of the contents of an illegally overheard conversation (privileged) and the act of illegally recording a confidential telephone conversation or eavesdropping on a telephone conversation (unprivileged). *Id.*

The source of the counterclaim of bribery against the Appellants in this action stem from their meetings with Parr, in which they either told or inferred to him that he would lose his job and be added as a defendant to the lawsuit if he did not sign the affidavit they presented to him. We conclude that the gravamen of this action is communicative in nature. It was a conversation between parties and a witness during a judicial proceeding about testimony. Even so, this still does not impact the abuse of process claim, which is more about conduct, including the improper use of a statement in the process.

The Cross-Appellants argue that affirming the dismissal of these other claims would permit the privilege to be abused. This has been an issue since the inception of the privilege. "The judicial statement privilege is one that has been long adhered to in this jurisdiction and is rooted in public policy 'which looks to the free and unfettered administration of justice, though, as an incidental result, it may, in some instances, afford an immunity to the evil-disposed and malignant slanderer.'" *Halle, supra*, at 184 (citing *Schmitt v. Mann*, 163 S.W.2d 281, 284 (Ky. 1942)). While this type of behavior is certainly not to be condoned, we

-61-

determine it is protected by the judicial statements privilege when applied to the dismissed claims, and we therefore affirm the circuit court's ruling as to the counterclaim other than abuse of process.

## CONCLUSION

On Appeal No. 2022-CA-1166-MR, we affirm the Nelson Circuit Court's orders on the statute of limitations conclusion, the damages awarded to PSC for $3,400, and its judgment of liability on the abuse of process claim regarding the Parr Affidavit, which includes the percentages of fault assessed for that liability. But we must vacate the judgment of abuse of process regarding the initial filing of the lawsuit, as that act alone cannot qualify as an abuse of process. We remand for the limited purpose of proceeding to determine the damages, compensatory and punitive, which a jury will determine anew, for the abuse of process proven relating to the Parr Affidavit. It will be for the parties and the circuit court to determine how best to present evidence about the whole picture of the abuse of process in the context of the suit so that the jury may assess damages. On Cross-Appeal No. 2021-CA-0431-MR, we affirm the Nelson Circuit Court's order dismissing the counts of the counterclaim other than abuse of process because these other claims were prohibited by the judicial statements privilege as a matter of law.

ALL CONCUR.

BRIEFS FOR
APPELLANTS/CROSS-
APPELLEES:

Michael P. Abate
David S. Kaplan
Casey L. Hinkle
Louisville, Kentucky

ORAL ARGUMENT FOR
APPELLANTS/CROSS-
APPELLEES:

Michael P. Abate
Louisville, Kentucky

BRIEF FOR APPELLEES/CROSS-
APPELLANTS:

Brian M. Johnson
Logan J. Mayfield
Lexington, Kentucky

ORAL ARGUMENTS FOR
APPELLEES/CROSS-
APPELLANTS:

Brian M. Johnson
Lexington, Kentucky